**Willie L. JONES, Plaintiff,**

v.

**UNITED STATES DRUG ENFORCEMENT ADMINISTRATION, Claude Byrum, Stephen A. Wood, and one additional unknown officer, Defendants.**

No. 3:91–0520.

United States District Court,
M.D. Tennessee,
Nashville Division.

April 21, 1993.

699

E.E. (Bo) Edwards, III, Edwards & Simmons, Nashville, TN, for plaintiff.

Michael L. Roden, Office of U.S. Atty., Nashville, TN, for defendants.

WISEMAN, District Judge.

## I

On February 27, 1991, three police officers seized $9000.00 in United States currency from Willie L. Jones at the Nashville International Airport. The currency was subsequently the subject of summary forfeiture proceedings by the Drug Enforcement Administration (DEA) of the United States Department of Justice. In this action, Mr. Jones seeks the return of his currency and declaratory relief against the officers—Claude Byrum and Stephen Wood of the Metropolitan Nashville Police Department and Taran Perry of the Metropolitan Airport Authority—and the DEA. The case was tried to the Court on September 17–23, 1992, after the Court orally denied both parties' Motions for Summary Judgment.

This Memorandum constitutes the Court's Findings of Fact and Conclusions of Law. For the reasons described below, the Court concludes that the Government failed to carry its burden of establishing probable cause for the forfeiture, and orders the Government to restore $9,000.00 to Mr. Jones. The Court grants Mr. Jones a declaratory judgment that officers of the Drug Interdiction Unit (DIU) seized his currency in violation of his Fourth Amendment rights, but denies his request for injunctive relief against the DIU.

## II

### Findings of Fact

*The Airport Seizure*

1. In the afternoon of February 27, 1991, Willie Jones came to the American Airlines ticket counter where a ticket agent, Mary Lou Wadley, was working. He told Ms. Wadley his name, and that he had reserva-

tions on a flight to Houston. He did not ask to check any luggage, and carried one small overnight bag. Ms. Wadley verified his identity with his driver's license and a credit card, and told him that the ticket would cost $267.00; Mr. Jones handed her the payment in cash. Ms. Wadley had become concerned by now, because she felt that Mr. Jones appeared to be nervous, and looked behind himself often. The airport was in a heightened state of security because of Operation Desert Storm, and Ms. Wadley decided to discuss her concerns about Mr. Jones with her supervisor. She told Mr. Jones that she was unsure how to handle a cash payment, and stepped into a back room where her supervisor told her that no action was necessary because Mr. Jones had a return ticket. On her return, Mr. Jones, in an attempt to alleviate any problems posed by his cash payment, offered to write a check instead. Ms. Wadley told him that everything was in order, issued him the ticket, and instructed him that the plane would depart from gate C-8. At some point, Ms. Wadley informed the lead ticket agent of her concerns. See Record at 5-15 (testimony of Mary Lou Wadley); id. at 210-212, 290-292 (testimony of Willie Jones).

2. Although the testimony at trial regarding Mr. Jones's appearance at the ticket counter was contradictory, the Court finds that he did behave nervously. Ms. Wadley says that he appeared nervous, and that this motivated her to speak with her supervisors. Mr. Jones denies that he was behaving in a nervous manner. Ms. Wadley specifically testified, however, that the cash payment and the short stay in Houston did not concern her, and there was no evidence of other factors which would explain why she alerted her supervisors about Mr. Jones. The Court credits her testimony, therefore, and concludes that Mr. Jones appeared to be nervous at the ticket counter.

The lead agent to whom Mary Lou Wadley had spoken at the American Airlines counter placed a call to the Drug Interdiction Unit office, located in the parking garage at the Nashville Airport. Sergeant Claude Byrum answered the phone, and the lead agent told him of Mr. Jones's nervousness. She also gave Sergeant Byrum Mr. Jones's name, flight information, a description of his physical characteristics and clothing, and she told Sergeant Byrum that Mr. Jones had paid cash for his ticket. Sergeant Byrum left the office to locate Mr. Jones. See Record at 17-18, 20, 74-77 (testimony of Sergeant Claude Byrum).

3. Sergeant Byrum met two other officers of the Drug Interdiction Unit, Officers Taran Perry and Steve Wood of the Metropolitan Nashville Airport Authority, inside the airport terminal between the ticket counters and Concourse C. Sergeant Byrum related to his fellow officers the information he had received, and the men spotted Mr. Jones departing the security checkpoint and beginning to walk down the concourse. Officer Wood remained behind at the checkpoint to speak with the checkpoint employees, while Sergeant Byrum and Officer Perry followed Mr. Jones. See Record at 18-21, 77-79 (testimony of Sergeant Byrum).

4. Passing through the checkpoint had been uneventful for Mr. Jones. The magnetometer did not go off as he walked through it, and he permitted the attendant to open and inspect his carry-on bag. Later, Mr. Jones recalled seeing Officer Woods at the checkpoint. Officer Woods asked the attendant who had inspected the overnight bag what it contained, and she told him that it contained personal items, some clothing, and a paper with numbers written on it. See Record at 213, 294-95 (testimony of Mr. Jones); id. at 471-73 (testimony of Officer Wood).[1]

5. Sergeant Byrum testified that as he and Officer Perry followed Mr. Jones down the concourse, he observed a bulge on Mr. Jones's left side, and that this observation

---

1. The paper was, in fact, a small pad of paper, which has numbers written on the top sheet. Mr. Jones testified that the pad had remained in his bag following a previous trip. See Plaintiff's Exhibit 9; Record at 213-14 (testimony of Mr. Jones).

The Government offered no contrary proof, and does not argue that the pad is a factor supporting probable cause for the money's seizure or its forfeiture. Therefore, the Court will disregard the pad.

raised concerns in his mind that Mr. Jones was carrying a weapon which had eluded detection by the magnetometer, or that he was "body-packing" drugs or currency. He mentioned to Officer Perry that Mr. Jones's jacket appeared to be "pooched out," and Officer Perry testified that he also observed a bulge on Mr. Jones's left side. The Plaintiff rebutted this testimony by an in-court demonstration. Sergeant Byrum was unable to detect the pouch (filled with tissue paper) on Mr. Jones's person even with a very close inspection.

The demonstration challenged Sergeant Byrum's and Officer Perry's testimony, and the Court finds that the officers in fact did not observe a bulge on Mr. Jones until sometime later. It is hard to believe that Sergeant Byrum could see a bulge from the money pouch on Mr. Jones as he walked down the concourse away from Sergeant Byrum and was 40–50 feet ahead of him, when Sergeant Byrum couldn't see the bulge from the money pouch in the courtroom when he was within 5 feet of Mr. Jones. As for Mr. Jones's "pooched out" jacket, the Court finds that this effect was probably just the natural posture of a person who is carrying an overnight bag in one hand, with nothing in the other to act as a counterweight. The empty hand tends to hang away from the body slightly (as shown in Plaintiff's Exhibits 8A–G).

See Record at 21–22, 25–26, 28–29, 83–88, R127–28 (testimony of Sergeant Byrum); id. at 291–93 (testimony of Mr. Jones); id. at 419–24, 435–36 (testimony of Officer Perry); compare Plaintiff's Exhibit 25 (the black nylon money pouch with tissue paper) to Defendants' Exhibits 16 and 17 (photographs showing the currency which the money pouch contained).

6. Mr. Jones continued down the concourse toward gate C–8, and then entered the men's restroom. Sergeant Byrum, believing that he recognized Mr. Jones as a man named "Little" who had been a suspect in a case involving drugs, followed Mr. Jones into the bathroom. Upon closer observation, Sergeant Byrum realized that he had been mistaken. Mr. Jones left the restroom and walked down to gate C–8. See Record at

21–23, 79 (testimony of Sergeant Byrum); id. at 213, 295–96 (testimony of Mr. Jones).

7. At the gate, Mr. Jones sat with his back to the windows which faced the airport ramp. The police officers sat facing him across the concourse in the passenger area for gate C–6, and observed him. The officers each testified that Mr. Jones sat straight in his seat and looked around the departure lounge nervously as they watched him. At some point, the officers testified, Mr. Jones spotted them watching him, and he focussed his attention on them. Mr. Jones denied acting in this fashion, and stated that he sat slightly twisted in his chair in order to observe the movements of airplanes and tractors on the ramp outside the window. He recalled being particularly interested in the airlines' use of Koboda tractors, because such tractors are used in landscaping.

Although the Court credits the officers' testimony, their observation of Mr. Jones's nervousness lacks significant probative weight. The testimony, which was credible on both sides, is easily reconciled. The officers' observations are not entirely inconsistent with the appearance from across an airport concourse of a man who is behaving as Mr. Jones claimed to have behaved. It is also a reasonable inference that a person sitting alone in an airport departure lounge would find the fixed attention of three strangers to be curious. Nervousness, particularly at the time in question, is also not a distinguishing characteristic. People who travel by air infrequently are often nervous about their trip and the dangers, real or imaginary, which air travel poses to them. In addition, the testimony of Mary Lou Wadley, and indeed, that of the officers themselves, established that people at the airport were anxious about travel during the period of the Desert Storm war. The Court concludes that although the officers may have observed what they took to be "hawking," this observation is of relatively low probative value. See Record at 23–26, 80–83 (testimony of Sergeant Byrum); id. at 213–28, 296 (testimony of Mr. Jones); id. at 418–419 (testimony of Officer Perry); id. at 474–76 (testimony of Officer Wood); Plaintiff's Exhibits 8A–B (photographs of Mr. Jones); Defen-

dants' Exhibits 8–11 (photographs of the departure lounge at gate C–8).

8. Sergeant Byrum and Officer Wood left Officer Perry where they were sitting, approached Mr. Jones, addressed him by name, and introduced themselves. He was surprised that the two men knew who he was. They asked him if he would step aside to a more private area, and he agreed. Mr. Jones claimed to have seen Sergeant Byrum's gun when the officer introduced himself and his partner. The testimony on this point at trial was in dispute, however. Sergeant Byrum testified that the gun was not visible, and that he takes care to hide it because passersby may become alarmed at the sight of a man in plain clothes carrying a gun in the secured parts of the airport.

The Court finds that the gun was, in fact, visible to Mr. Jones as he was seated in the departure lounge. Sergeant Byrum carried his gun in a position from which it could be readily observed by someone seated and able to see inside his right front jacket. Although Sergeant Byrum may be careful to conceal it from the general public, there was no need for such precautions when he approached Mr. Jones, because Mr. Jones's back was to the window. It would have been impossible for bystanders to see the gun unless they were sitting next to Mr. Jones. Nevertheless, the Court finds that Mr. Jones's consent to walk with and speak with the officers and to accompany them to the jetway was voluntarily given. See Record at 26–29, 57–58, 88–90, 128–29 (testimony of Sergeant Byrum); id. at 218, 296–300 (testimony of Mr. Jones); id. at 476 (testimony of Officer Wood); Defendants' Exhibit 17 (photograph of Sergeant Byrum, with his jacket off and with the gun visible).

9. The officers led Mr. Jones across the concourse to gate C–9, at which there were relatively few people. Officer Perry joined his companions, and the three men passed through double glass doors into the empty jetway. See Record at 29–32, 89–91 (testimony of Sergeant Byrum); id. at 218–19, 220–21, 299–302 (testimony of Mr. Jones); id. at 434–35 (testimony of Officer Perry); id. at 476–79 (testimony of Officer Wood).

10. Once in the jetway, Sergeant Byrum told Mr. Jones that the three officers were investigating the movement of drugs and currency through the airport, and asked to see Mr. Jones's airline ticket. Mr. Jones produced the ticket, which Sergeant Byrum examined. Sergeant Byrum observed that Mr. Jones's hands shook as he handed over the ticket. Sergeant Byrum could see that Mr. Jones's destination was Houston, that there was a short turnaround in Houston, and that the ticket was issued in Mr. Jones's name. He handed the ticket to Officer Wood, and asked Mr. Jones for his driver's license. Mr. Jones produced the license, and Sergeant Byrum confirmed Mr. Jones's identity.

Sergeant Byrum asked Mr. Jones for permission to search his carry-on bag, and Mr. Jones assented. At this point, the evidence produced at the trial begins to diverge. Sergeant Byrum testified that he requested permission to search both Mr. Jones's bag and person, and that Mr. Jones consented. Mr. Jones testified that Sergeant Byrum did not mention searching his person, and that his subsequent consent did not extend to such a search.

Mr. Jones's testimony on this point was the most credible, and the Court finds that he consented to a search of his carry-on bag, and was not asked for consent to search his person. It is likely that Mr. Jones would more readily consent to a search of his bag than of his person, too—in fact, he had already consented to one search of his bag a mere five minutes before at the security checkpoint, and the second search would invade his privacy to no greater extent. Additionally, the officers waited several minutes before conducting a search of Mr. Jones's person. In light of their stated suspicions, it is unlikely that had they already obtained permission to search him, they would have waited as long as they did before patting him down.

Officer Wood searched the bag, placing the articles he found—a pair of shoes, a change of clothing, and some toiletries—on the floor beside him. While he searched, Sergeant Byrum asked Mr. Jones whether he was going to Houston, what business he was in, and whether the trip was for business or

pleasure. Mr. Jones confirmed that he was going to Houston, and answered that he was in the landscaping business, and that the trip was for business.

While this was going on, Mr. Jones stood with his back to the jetway, and Sergeant Byrum stood in front of him. Officer Wood knelt to Sergeant Byrum's right as he searched the bag, and Officer Perry stood between and behind his two companions.

Mr. Jones testified that in addition to these innocuous questions, a more accusatory conversation also took place. According to Mr. Jones, Sergeant Byrum stated: "If you've got it, you might as well pull it out. Where is it?" Mr. Jones replied: "Where is what?" Sergeant Jones answered: "Don't play games. We're going to search you anyway." Sergeant Byrum denies that this conversation took place, but the conversation is consistent with the uncontradicted testimony regarding other statements the officers made.

The testimony was consistent, however, that at some point, Sergeant Byrum asked Mr. Jones whether he was carrying any drugs or currency.[2] Mr. Jones stated that he didn't know what "currency" meant. Sergeant Byrum asked: "How many thousands are you carrying or packing on your body?" The police officers testified that Mr. Jones pulled out his wallet, showed them the money it contained, and told them: "Here's my money." Mr. Jones denies showing them his billfold. By all accounts, the officers had at this time focussed their attention on whether or not Mr. Jones carried contraband—either drugs, or drug-connected money. The Court finds that the incident with the billfold is not material. Moreover, it is understandable that a person carrying a large sum of money may act deceptively; for example, they might suspect that renegade police officers or imposters are "shaking them down," and they may wish to hide their property as eagerly as from a criminal.

Sergeant Byrum and Officer Perry next turned to Mr. Jones's person. Sergeant Byrum or Officer Perry asked Mr. Jones to remove his jacket, and he did. Upon Mr.

Jones's removing his jacket, the officers observed a bulge on Mr. Jones's left side. The stories of the parties diverge again at this point. According to Sergeant Byrum, Officer Perry reached over to Mr. Jones's left side, patted the object forming the bulge, and asked: "What's this?" Sergeant Byrum testified that either he or Officer Perry next asked Mr. Jones if he would remove the object, and Mr. Jones complied. Officer Perry's story differs from that of Sergeant Byrum. According to Officer Perry, he patted Mr. Jones on the left side with his own left hand while asking Mr. Jones "What's this?" Mr. Jones then raised his left arm halfway, pulled his shirttail out, and reached for the object. As he did so, Officer Perry blocked Mr. Jones's left arm with his own right arm, reached across Mr. Jones's body with his right arm, and pulled the pouch from his waistband. Mr. Jones offers a third version of events. According to him, Officer Perry patted first his right, and then his left side. Officer Perry then told Mr. Jones to raise his arm, and he complied. As he did, Officer Perry pulled Mr. Jones's shirttail out, reached across and grabbed the pouch.

The two witnesses with the best recollection of the events were Mr. Jones and Officer Perry, who were the participants in the search. Sergeant Byrum's recollection of the events was unconvincing, and inconsistent with those of the other men. Both Officer Perry and Mr. Jones agree that Officer Perry said "what's this," reached across Mr. Jones's body, and pulled out the pouch. They disagree about whether Officer Perry patted Mr. Jones's right side, about whether Officer Perry instructed Mr. Jones to raise his left arm, and about which one pulled Mr. Jones's shirttail out. The Court finds, based on the testimony of these two witnesses, that Officer Perry patted Mr. Jones's left side only, that Mr. Jones pulled out his own shirttail. Once he had ready access to the pouch, Officer Perry pulled it out from beneath Mr. Jones's waistband.

Officer Perry then asked Mr. Jones if he could inspect the pouch. Mr. Jones did not

---

**2.** Sergeant Byrum testified that this discussion occurred during Officer Wood's search of the bag, but Officer Perry testified that it came before. The specific timing is not material, however.

reply.[3] Officer Perry unzipped the pouch, and saw the currency it contained. Sergeant Byrum asked Mr. Jones if the currency belonged to him. Mr. Jones answered that it did. Sergeant Byrum then asked Mr. Jones how much money there was in the pouch, and he testified that Mr. Jones responded that he did not know. According to Mr. Jones, he did not respond because he was unsure of Sergeant Byrum's intentions. The Court credits Mr. Jones's testimony on this issue. As discussed above, Sergeant Byrum's testimony on the encounter in the jetway was less credible than that of the other participants, possibly because of the large number of similar incidents in which he has been involved. Furthermore, Mr. Jones's professed unresponsiveness is consistent with his subsequent behavior.

The witnesses also disagree on when Mr. Jones's airline tickets were returned to him. Mr. Jones stated that he did not receive them back until he reached the Drug Interdiction Unit office. Officer Wood testified that he "believed" that Mr. Jones received the ticket and driver's license in the jetway. Sergeant Byrum was unsure when this took place. Given the equivocal testimony of the police officers, the Court finds that the officers retained Mr. Jones's ticket and driver's license until they permitted him to leave the Drug Interdiction Unit office.

For evidence relating to the searches, see Record at 32–41, 47, 91–104, 133 (testimony of Sergeant Byrum); id. at 219–20, 221–27, 302–11 (testimony of Mr. Jones); id. at 423, 436–44 (testimony of Officer Perry); id. at 479–83, 488 (testimony of Officer Wood); Defendants' Exhibit 12 (photograph showing the inside of the jetway at gate C–9, facing the departure lounge).

11. After discovering the money, Sergeant Byrum told Mr. Jones that he was detaining the money, and asked Mr. Jones if he would accompany the officers back to the Drug Interdiction Unit Office. Because the officers now possessed not only his currency, but his airline ticket and driver's license, Mr. Jones agreed, and the four men left the jetway and began to walk to the office. See Record at 41–42, 47, 103–104 (testimony of Sergeant Byrum); id. at 228, 310–11 (testimony of Mr. Jones); id, at 444 (testimony of Officer Perry); id. at 481 (testimony of Officer Wood).

12. They walked down the concourse back to the Drug Interdiction Unit office in the parking garage outside the airport's front entrance. Mr. Jones and Sergeant Byrum walked in front, with Officer Perry bringing up the rear.[4] As they walked, Sergeant Byrum questioned Mr. Jones. He began by asking Mr. Jones what his plans were in Houston. Mr. Jones responded that he was going to buy shrubs and bushes for his landscaping business. Sergeant Byrum asked how Mr. Jones intended to make these purchases within the hour and a half between his scheduled arrival and departure. Mr. Jones did not respond. Sergeant Byrum asked Mr. Jones if he knew anyone in Houston. Mr. Jones responded that he did not. Sergeant Byrum asked Mr. Jones if he knew anyone in Texas whom Officer Wood could call on his mobile telephone to verify Mr. Jones's plans. Finally, Sergeant Byrum asked Mr. Jones how he planned to get the shrubs he was to purchase back to Nashville, and sarcastically asked if he would take them on the plane with him. The testimony at trial on Mr. Jones's response to these last two questions is contradictory. Sergeant Byrum testified that Mr. Jones responded to both, stating that he knew of nobody to call, and that he intended to return to Houston at a later date with a truck in which he would carry the shrubs back to Nashville. Mr. Jones and the two other officers all recalled, however, that Mr. Jones ceased to answer Sergeant Byrum's questions long before the final, sarcastic question about returning with them on the airplane. Mr. Jones testified that by then he had concluded that the officers were not

---

3. According to Sergeant Byrum, Mr. Jones consented to the search of the pouch. The Court does not credit this testimony, in light of Officer Perry's admission and Mr. Jones's assertion that Mr. Jones did not respond to the request.

4. The evidence about Officer Wood's position is contradictory. Sergeant Byrum testified that he and Officer Wood flanked Mr. Jones. Mr. Jones testified that they walked two abreast, with Officers Wood and Perry in the rear. The point is not material, however.

crediting his responses, and that they were "playing games" with him. The Court finds that Mr. Jones did not respond at all to the last two questions.

In addition to the foregoing narrative, the basic structure of which all witnesses agree upon, Mr. Jones testified that two side conversations took place. In the first, an unknown officer asked if the "dog is on duty." To this, another unknown officer responded: "Yes, and he hasn't been fed today." Officer Perry denied that the conversation took place, reasoning that all of the officers knew that the dog was on duty, because Officer Perry was the dog's handler. Officer Wood testified that he did not remember if this conversation took place. Although it is not a material fact, the Court finds, based on the credible testimony of Mr. Jones, that the conversation did take place. It is quite clear from the testimony that the officers' behavior at this point was casual and sarcastic, that they believed that the seizure of the currency was all but a *fait accompli*, and that they cared little for Mr. Jones's feelings of insecurity. Officer Perry's explanation is unconvincing; the question "Is the dog on duty?" was directed rhetorically at Mr. Jones, and its intended effect was not to find out if, in fact, the dog was on duty.

This insecurity and concern were manifest in the second side conversation, which Mr. Jones recounted. At some point, after he had looked behind him several times at Officer Perry, Officer Perry asked him why Mr. Jones was looking at him. Mr. Jones responded that he was doing this because Officer Perry had the currency. At trial, Mr. Jones explained that he feared that the officers might split up and run from him once they left the terminal building, and he wanted to be sure that he knew where Officer Perry was so that he could chase the one carrying his money. No witness contradicted Mr. Jones's testimony regarding this conversation.

For testimony on the events on the walk from gate C–9 to the Drug Interdiction Unit office, see Record at 42–43, 105–106 (testimony of Sergeant Byrum); id. at 228–34, 311–16 (testimony of Mr. Jones); id. at 445–46 (testimony of Officer Perry); id. at 484–85 (testimony of Officer Wood).

13. Upon their arrival at the Drug Interdiction Unit office, Sergeant Byrum sat at his desk and instructed Mr. Jones to sit in a chair beside the desk. Officer Wood asked Officer Perry to get his drug dog, and they stepped out of the office, carrying the pouch. Sergeant Byrum continued to question Mr. Jones, and took down notes of the conversation. After obtaining Mr. Jones's address and business card, Sergeant Byrum asked him whether he had made purchases in Houston before and whether he knew anyone there. Mr. Jones responded negatively to both questions. Mr. Jones provided Sergeant Byrum with a business card, and several names as references, including Thomas Gentry, who is a business associate of Mr. Jones, Raul Camacho, who is a former customer of Mr. Jones and a member of the Metropolitan Nashville Police Department's Vice Squad, and an FBI agent, who is another former customer. From the business card, Sergeant Byrum also obtained the name and phone number of Barbara Fitzpatrick, an acquaintance of Mr. Jones.

At some point, Sergeant Byrum asked Mr. Jones if he had ever been arrested on drug charges in the United States. Mr. Jones stated that he had not. Officer Wood then performed a search for outstanding warrants on the computer terminal in the office, and told Sergeant Byrum that Mr. Jones was "clean."

Immediately outside the office, the other officers were conducting a test using a narcotics-trained dog named Dakota. Officer Wood took the pouch and placed it alongside the building while Officer Perry, Dakota's handler, retrieved the dog from its kennel adjoining the office. Officer Perry instructed the dog to "find it," and set the dog to work among the trash and other articles against the building. Dakota, who is trained to react "passively" to narcotics, laid down in front of the pouch, signalling that he had smelled narcotics. The officers hid the pouch again and repeated the test, and Dakota again reacted to the pouch containing the money.

Officer Wood returned to the office, and informed Sergeant Byrum of the dog's reac-

tion. Sergeant Byrum then told Mr. Jones that the officers were seizing the money. They sealed the currency in a plastic evidence pouch, and instructed Mr. Jones that he would have to contact someone connected with their office and hire an attorney to file a claim for the currency. The officers then wrote Mr. Jones a receipt for an "undetermined amount of U.S. currency." Mr. Jones objected, and asked the officers to count the money together with him. They refused to count the money, citing DEA policy.

Mr. Jones, who had become convinced that he would be arrested, asked the officers if they were going to take him into custody. Sergeant Byrum replied that there were no grounds on which to arrest him, and jokingly said: "Now you can go to Texas."

Mr. Jones left the office, exchanged his ticket for cash at the American Airlines ticket counter, and drove away in his truck. After driving on the freeway for several minutes, he stopped and telephoned George Alexander. Mr. Jones had been concerned that the officers might steal some of the money, and after speaking to Mr. Alexander, Mr. Jones returned to the Drug Interdiction Unit office.

Mr. Jones repeated his request that the Officers count the money and provide him with a receipt describing the total, but the officers again refused. At some point, Sergeant Byrum offered to add a note to the receipt stating that there were nine bundles of currency, but he eventually changed his mind, and refused to amend the receipt at all.[5]

For evidence on the events which occurred at the Drug Interdiction Unit office, see Record at 47–54, 109–123, 134–35 (testimony of Sergeant Byrum); id. at 234–39; 319–25 (testimony of Mr. Jones); id. at 414–18; 429–33 (testimony of Officer Perry); id. at 470–71; 489 (testimony of Officer Wood); Defendants' Exhibit 13 (Sergeant Byrum's notes of his conversation with Mr. Jones); Plaintiff's Ex-

hibit 11 (the receipt for the currency); Defendants' Exhibits 15 (photograph of Mr. Jones seated at Sergeant Byrum's desk), 16 (photograph of Officer Perry, holding the sealed evidence bag containing the currency, and Dakota), and 17 (photograph of Sergeant Byrum seated, holding the evidence bag containing the currency).

14. Mr. Jones offered into evidence a copy of an internal DEA memorandum, from Sanford A. Angelos, Forensic Chemist, to Benjamin Perillo, Laboratory Chief of the DEA's North Central Laboratory, reporting the results of chemical trace analyses on batches of United States currency, and similar tests performed on belts used in currency sorting machines in use at Federal Reserve Banks. The report found that "[o]ne-third [contamination] of a randomly selected sample is a significant argument that the general currency in circulation is contaminated with traces of cocaine. The amount of the cocaine detected ranged from 2.4 to 12.3 nanograms per bill." In addition, the belts from the sorting apparatus were contaminated with an estimated 200 nanograms detected. Mr. Angelos concluded:

> The results, from the samples received from the Chicago Federal Reserve Bank, confirms the presence of traces of cocaine on general circulation U.S. currency. Moreover, the results indicate that the Federal Reserve Bank itself may be contaminating the currency through the normal procedures used by the bank. The belts must be initially contaminated by the currency, then in turn the belts will contaminate "clean" currency. These results indicate the termination of the project as all aspects show that the forensic usefulness of trace analysis is at best limited.

Plaintiff's Exhibit 18, at 3.

*Mr. Jones's Explanation*

Both in pretrial pleadings and in court, Mr. Jones offered several purposes for his

---

5. Sergeant Byrum's testimony on this point was misleading. At first, Sergeant Byrum testified that Mr. Jones had first suggested that the receipt reflect the number of bundles of currency. He testified that drug couriers typically bundle their currency, and that Mr. Jones's request was a "red flag" to him that the money was related to

narcotics trafficking. See Record at 52–53 (testimony of Sergeant Byrum). On cross-examination, however, Sergeant Byrum admitted that in fact, he himself had suggested that the receipt reflect that there were nine bundles. See id. at 123.

planned trip to the Houston area. He stated that he intended to purchase plants for inventory from nurseries in the area, which he heard offered better prices than nurseries in the Nashville area. He had learned of these companies at a minority business development seminar held in Nashville a few weeks before his trip, in January, 1991. In addition, he asserted that he was romantically interested in a woman who lived in Houston, Kathy Roberts, whom he had met at a party in Nashville the previous fall. The Court makes the following findings regarding these explanations: [6]

### The Business Motivation

15. From January 27, 1991, through February 1, 1991, Shelby State Community College presented a seminar entitled "Bid Simulation and Project Management Retreat" at the Doubletree Hotel in Nashville, under the auspices of the Tennessee Department of Transportation and the Federal Highway Administration Supportive Services Program for Disadvantaged Business Enterprises. Mr. Jones stated that he and his friend George Alexander attended the seminar. According to Mr. Jones, the two met some men there who had been involved in the landscaping business, and who were from Houston. These men told Mr. Jones and Mr. Alexander that nurseries in the Houston area sold hollies and other shrubs at attractive prices. Mr. Jones claimed that the men gave him a list of nurseries to visit, and that he contacted them before his planned trip.

The Defendants attacked this explanation on several fronts. First, they offered the testimony of Shirley Ann Iter Brooks, the seminar coordinator with Shelby State Community College, who produced a list of the participants at the seminar who signed the register. None of the participants was from outside of Tennessee, and the sole out-of-state presenter was from Atlanta, Georgia.

In addition, although Mr. Alexander's name appears on the roster along with that of his wife, Mr. Jones's name is not listed.

More damaging to Mr. Jones's testimony was the evidence regarding his contacts with Houston nurseries. He claimed to have called the four nurseries listed for him by the seminar participant from Texas, yet the only record of such contacts is from March, 1991, nearly a month after the planned trip and the cash's seizure. Mr. Jones placed phone calls to Greenstock Nurseries, of Huffman, Texas, and Hardin Wholesale, of Houston, on March 18, 1991. In a pretrial affidavit, he claimed to have been placed on Greenstock's mailing list in February, 1991, and received a brochure from that company mailed on March 25, 1991.

The Court finds that the seminar explanation is not credible. Although the seminar's coordinators did not require participants to sign in every day, Mr. Jones's absence from the list strongly suggests that he did not attend. The March, 1991, phone calls to Texas nurseries, followed a week later by Greenstock's mailing, strongly suggests that Mr. Jones's first contacts with the nurseries occurred after the seizure, and not before. There are several ways to reconcile the evidence in Mr. Jones's favor, however, the most plausible conclusion—and the Court's finding—is that Mr. Jones created the story after the seizure to support his claim that the trip had a legitimate purpose.

See Record at 146–62, 183–84, 186–87, 189, 271–73 (testimony of Mr. Jones); id. at 337 (testimony of Mr. Gentry); id. at 365, 398–402, 411 (testimony of Mr. Alexander); Defendants' Exhibit 31 (deposition of Ms. Brooks); Defendants' Exhibit 28 (Mr. Jones's telephone records); Defendants' Exhibit 29 (Mr. Jones affidavit, with the mailing from Greenstock Nurseries attached as Ex-

---

6. The burden in a § 881 hearing is on the government to establish probable cause for the forfeiture. See 19 U.S.C. § 1615, made applicable to drug forfeiture hearings by 21 U.S.C. § 881(d). The burden then shifts to the claimant to establish by a preponderance of the evidence that the property at issue is not connected to illegal drug activity. See Conclusion 1, below. The law of this Circuit is that to satisfy its burden, the government may introduce evidence which it obtains

up until the hearing on probable cause. Therefore, the statements Mr. Jones has made following the seizure are admissible to demonstrate probable cause. It is for this reason alone that the Court makes these findings regarding Mr. Jones's explanation. The Court discusses below its disagreement with the Sixth Circuit's rulings on the scope of admissible evidence in a probable cause hearing under § 881.

hibit 2); Plaintiff's Exhibits 12, 13, 14–A and –B, and 15 (seminar materials provided by Mr. Alexander).

16. The weaknesses in Mr. Jones's story regarding the Doubletree seminar notwithstanding, it is clear from the evidence presented at trial that Mr. Jones's primary business is as a landscaper, and that his business, albeit small, is bona fide. The evidence at trial demonstrated unequivocally that Mr. Jones operates a small landscaping business, and serves as a subcontractor on contracts of Thomas Gentry and Associates, and Landau Landscaping (owned and operated by Mr. Alexander).

In an attempt at discrediting Mr. Jones's stated intention to purchase plants in Houston, the Defendants introduced evidence that Mr. Jones rents some land and a small garage on Murfreesboro Road in Nashville from William Mesner. The shop contains, among other things, landscaping tools, and the evidence indicates that although plants are not kept in the ground as inventory at this location, they are stored at that location for short periods in their plastic buckets.[7]

In addition, Mr. Jones presented evidence that he and Mr. Alexander had, at the time of the seizure, been renting vacant land on Jefferson Street in Nashville from the Church of God, whose building adjoined the land. They stored equipment and stock at that location. They later left the Jefferson Street location for a larger lot on Clarksville Highway in Nashville. ·

Far from establishing Mr. Jones's business as a sham, the Defendants' own evidence, and that of Mr. Jones, demonstrates unequivocally that Mr. Jones is actively engaged in landscaping. William Mesner, for whom Mr. Jones works to pay the rent on his Murfreesboro garage, testified that his relationship with the Plaintiff is very good, and that he

trusts him to maintain his property well. Similarly, Mr. Gentry, whom the Defendants called as a witness, responded to a question about Mr. Jones's landscaping work: "I would say he is the best in the state of Tennessee." Finally, Mr. Gentry also testified that in early 1991, he made a large payment to Landau Landscaping, who was a subcontractor on a contract Mr. Gentry's company performed for the Tennessee Department of Transportation. Mr. Gentry understood that some of this money was to go to Mr. Jones, because Mr. Jones had performed most of the work on the job.

The Court finds that Mr. Jones operates a small landscaping business, and that he frequently subcontracts with his friends' companies. Mr. Jones has maintained inventories of plants in the past, although the fact that he stores them in their plastic buckets suggests that he has not maintained a large inventory.

See Record at 138–45, 244–48; 256–71 (testimony of Mr. Jones); id. at 336, 342, 344 (testimony of Thomas Gentry); id. at 348–54 (testimony of William Mesner); Defendants' Exhibits 18–25 and Plaintiff's Exhibits 2A–H (photographs showing the Murfreesboro Road location); Plaintiff's Exhibits 1A–H (photographs showing the Jefferson Street location); Plaintiff's Exhibits 3A–E (photographs showing the Clarksville Highway location).

### Kathy Roberts–Johnson

17. Another reason Mr. Jones offered for his planned trip to Texas was to meet a woman with whom he wished to have a relationship, Kathy Roberts–Johnson.[8] Ms. Roberts–Johnson, who was a flight attendant for Continental Air Lines, met Mr. Jones at a party held in Nashville at the home of a friend. The two conversed, and upon her

---

7. The Defendants suggested during examination of Mr. Jones that his failure to list the tools kept in the garage on his *in forma pauperis* petition constituted misrepresentation. The Court disagrees, and observes that the Defendants' own evidence on this point supports the Court's earlier finding of indigency. An *in forma pauperis* petition is not a bankruptcy petition, and the petitioner need not list personal property of marginal value. It is difficult to imagine that there is a ready market for the items Mr. Jones stored in

the garage, or that any lender (including a pawn shop) would accept them as collateral for a loan.

8. Ms. Roberts–Johnson, née Kathy Roberts, changed her name upon marrying Robert Johnson on December 3, 1991. See Plaintiff's Exhibit 26, at 21 (deposition of Kathy Roberts–Johnson). She was unmarried at the time of Mr. Jones's planned trip.

return to Houston, Mr. Jones spoke with her frequently.

Although Mr. Jones testified that he was interested in having a romantic relationship with Ms. Roberts–Johnson, she testified that she did not consider their relationship romantic or sexual. The Court finds this difference unimportant; certainly this would not be the first time when such a misunderstanding existed between a man and a woman.

Except for their different views on the nature of the relationship, Mr. Jones's and Ms. Roberts–Johnson's stories of the planned trip are quite similar. They both expected Mr. Jones to arrive in the afternoon or evening of February 27, and they anticipated that he would visit nurseries and shop for cowboy boots the following day. The testimony of Mr. Jones on this point was credible, as is the deposition testimony of Ms. Roberts–Johnson, and the Court finds that Mr. Jones and Ms. Roberts–Johnson became acquainted during her previous visit to Nashville and planned to meet upon his arrival in Houston.

The fact that most of the long-distance phone calls to Ms. Roberts–Johnson were placed from Mr. Alexander's phone does not detract from Mr. Jones's and Ms. Roberts–Johnson's claim that they spoke frequently. Mr. Jones and Mr. Alexander are close associates, and it is not improbable that Mr. Jones would use Mr. Alexander's phone, as he testified.

The Court also finds that George Alexander travelled to Houston in early February, 1991, and stayed in a Comfort Inn hotel in Houston on the evening of February 12. Mr. Alexander testified that although he could not recall that specific trip, he went to Houston in early 1991 to attend drag-racing events there.

Evidence introduced at trial established that Ms. Roberts–Johnson's husband (Robert Johnson) was convicted in a Texas Court on drug-related charges in July or August of 1991. In addition, Ms. Roberts–Johnson's telephone number appeared on a pen register list as having been called from a phone owned by Freddy Lee Scott, who was convicted of crimes involving marijuana in 1990.[9]

See Record at 162–68, 185–86, 197–98, 232, 275–80, 325–27, 329 (testimony of Mr. Jones); id. at 364–65, 370–97, 403–06, 411–12 (testimony of Mr. Alexander); id. at 491–503 (testimony of Agent Campbell); Plaintiff's Exhibit 26 (deposition of Kathy Roberts–Johnson); Defendants' Exhibit 33 (Houston police department criminal history report for Robert Johnson); Plaintiff's Exhibit 16 (telephone record of Mr. Alexander); Defendants' Exhibit 34 (Mr. Alexander's Comfort Inn hotel bill).

### The Source of the Currency

18. Mr. Jones's explanation of the source of the currency he carried to the airport is entirely unpersuasive. In a pretrial deposition, he claimed that of the $9,000.00, $3,500.00 came from a check Mr. Alexander had written him on February 2, 1991, to pay him for work performed;[10] Mr. Alexander loaned him $2,700.00; Mr. Gentry loaned him $1,500.00; and the remainder ($1,300.00) came from his own funds, which he kept at his home along with the proceeds from Mr. Alexander's check. Mr. Gentry confirmed at trial that he had paid Mr. Alexander a large sum for subcontract work Mr. Alexander had undertaken, and that Mr. Alexander owed some of this money to Mr. Jones, who had, in turn, performed most of the work as a subcontractor to Mr. Alexander.

The dispute at trial centered on Mr. Gentry's participation. Mr. Gentry denied giving Mr. Jones the $1,500.00, although he acknowledged that the two men were in the custom of making short term cash loans to one another without documentation. More troubling was Mr. Gentry's testimony that Mr. Alexander and Mr. Jones telephoned him

9. The Court discusses in the Conclusions section of this opinion the extremely low probative weight of this evidence relating to drugs.

10. For some reason, Mr. Alexander dated this check February 2, 1990, although the bank cancelled it on February 4, 1991. The evidence at trial is that Mr. Alexander erred in writing the check. The Court finds this to be the case, given the fact that the bank cancelled it in 1991, and the tendency of drawers of checks to make errors in the year shortly after the start of a new year.

on the morning of the second day of Mr. Jones's deposition. According to Mr. Gentry, Mr. Alexander asked him to tell "whoever asked" that Mr. Gentry had loaned Mr. Jones $1,500.00 in anticipation of his trip to Texas. Mr. Gentry informed Officer Wood of this conversation an hour or so later, when Officer Wood interviewed him. Mr. Jones remained silent during the phone conversation. Despite Mr. Gentry's denial of the loan and refusal to make the statement, Mr. Jones reiterated his testimony later that day, and testified at his deposition that Mr. Gentry had provided the money. Mr. Alexander denies attempting to suborn perjury from Mr. Gentry, and says that he was merely joking.

The Court finds Mr. Alexander's explanation unconvincing, and concludes that he indeed attempted to persuade Mr. Gentry to lie to the authorities. Mr. Alexander's actions, and Mr. Jones's silence during the conversation, strongly belie the two men's statements regarding the true nature of Mr. Jones's intended trip.

See Record at 169–83; 187–89, 217, 227, 280–83 (testimony of Mr. Jones); id. at 338–41, 343 (testimony of Mr. Gentry); id. at 404–05, 408–10, 448–49 (testimony of Officer Wood). Plaintiff's Exhibit 7 (cancelled check for $3,500 from Mr. Alexander to Mr. Jones).

*Alleged Discrimination at the Nashville Airport*

Mr. Jones alleges that the officers of the Drug Interdiction Unit stopped him at the Nashville Airport because he is an African–American. To support this allegation, Mr. Jones offered evidence of four other incidents involving the DIU stopping and questioning members of minority groups, and evidence derived from a logbook the DIU began to keep a few months after the seizure of Mr. Jones's currency.

### Other Minority Incidents

Mr. Jones offered testimony relating to four incidents in which DIU officers stopped and questioned minority group members. These involved Samuel and Ida Carter, Harry Radliffe (a producer with the CBS news show "60 Minutes"), Julio Villarce, and Renardo and Ronardo Stewart.

19. On March 7, 1991, Ida and Samuel Carter (an African–American couple) learned that Mr. Carter's brother had died, and the couple made arrangements to fly from Nashville to Wilmington, Delaware for the funeral. Mr. Carter made reservations and purchased the tickets through a discounter, and he paid with a credit card. Upon their arrival at the airport, Mrs. Carter obtained the tickets and boarding passes while Mr. Carter parked the car. Mr. Carter met his wife, and because he was dissatisfied with their seat assignments, he returned to the ticket counter and had the assignments changed. Mr. Carter wore a close-fitting black leather jacket and cap which he had custom-made while in India during previous travels. Mrs. Carter wore a mink coat and leather pants.

After they passed through the security checkpoint, Sergeant Byrum and Officer Buck approached them, showed their badges, stated that they were from the DEA, and asked to speak with Mr. Carter in a less crowded part of the concourse. Mr. Carter asked Sergeant Byrum why he was being stopped; Sergeant Byrum did not reply, but repeated his request for Mr. Carter to step aside. Mr. Carter agreed.

After walking to a less crowded area of the concourse, Sergeant Byrum rapidly asked Mr. Carter a series of questions. He asked Mr. Carter his destination. Mr. Carter responded that they were flying to Philadelphia (where they were to connect with a flight to Wilmington). Sergeant Byrum asked Mr. Carter why they were travelling. Mr. Carter responded that they were going to his brother's funeral. Sergeant Byrum asked Mr. Carter whether they had any luggage. Mr. Carter responded that it had been checked at the curb.

Sergeant Byrum, who testified that he stopped Mr. Carter because of a suspicious bulge he observed at Mr. Carter's chest area, next asked Mr. Carter what he had inside his jacket. Mr. Carter, who by now had become frustrated, responded: "Nothing but air." Sergeant Byrum asked to see inside the jacket, and Mr. Carter opened the jacket, showing the officers that he had nothing concealed within.

At some point, Sergeant Byrum asked to see the Carters' tickets, and Mr. Carter's driver's license. They produced the tickets and identification, and the officers verified that they were travelling under their own names.

Mr. Carter asked Sergeant Byrum repeatedly why he had been stopped. Sergeant Byrum testified that he told Mr. Carter that he had observed a suspicious bulge; however, the Carters' consistent testimony contradicts this, and was that Sergeant Byrum responded that there was a heightened state of security because of the Gulf War and concerns about terrorism.[11]

Sergeant Byrum began asking questions which Mr. Carter had already answered, and Mr. Carter became quite frustrated. Mrs. Carter feared that her husband would lose his temper, and asked Sergeant Byrum if he was a Federal employee. Sergeant Byrum had told the Carters that he worked for the DEA, whose offices are located in the Federal building where Mrs. Carter works for the Internal Revenue Service, and Mrs. Carter, who stated that she felt she recognized most people in the building, was suspicious that she didn't recognize him. Sergeant Byrum stated that he worked for Metropolitan Nashville police, and Mrs. Carter showed Sergeant Byrum her I.R.S. identification card. Sergeant Byrum ceased questioning Mr. Carter, and the couple resumed their travel.

See Record at 518–23 (testimony Sergeant Byrum); id. at 538–47 (testimony of Mrs. Carter); id. at 549–58, 601–05 (testimony of Mr. Carter).

20. On December 10, 1991, Harry Radliffe II, a producer for the CBS news program "60 Minutes," while working on a story involving the seizure of Mr. Jones's currency, approached the American Airlines ticket counter and purchased with cash a round-trip ticket to Houston with a return flight for the same day. An employee of American Airlines called the DIU office and told Officer Patrick Wells that a casually dressed, stocky African–American man had just purchased a ticket with the characteristics just described.

Officer Wells and Sergeant Byrum came to the terminal building, spotted Mr. Radliffe, and approached him. They asked if they could speak with him, and he agreed. They asked him for his ticket and identification, asked him where he was going and for what purpose, and asked him if he was carrying any drugs or currency. Mr. Radliffe produced his CBS news identification, explained his purpose to the officers, and began to discuss with them their DIU work.

See Record at 523–36 (testimony of Sergeant Byrum); id. at 678–83 (testimony of Officer Wells).

21. On July 14, 1992, Julio Villarce, a Hispanic American, went to the Nashville Airport accompanied by his girlfriend, Linda Parker (a white American), and his friend, Francisco Narvarec (who is also Hispanic). Mr. Villarce and Ms. Parker testified that Mr. Villarce was contemplating purchasing a shoe repair machine in Texas, and Ms. Parker intended to accompany him on the trip.[12] Mr. Villarce and Ms. Parker did not know when they arrived at the airport early in the afternoon that they would travel that day but, upon seeing a convenient flight scheduled to depart at approximately 4:30 p.m., they purchased their tickets, and drove home to pack their bags. They returned to the airport shortly before the plane was scheduled to depart, checked a suitcase at the ticket counter, walked through the security checkpoint without incident, and took a seat in the departure lounge.

Meanwhile, a Delta airline employee had called Officer Patrick Wells of the DIU, and

---

11. The Court takes judicial notice that Operation Desert Storm took place from January 17 to February 28, 1991. Thus, when Mr. Carter was stopped on March 7, 1991, the war had been over for seven days. *1992 World Almanac* at 36–37.

12. The testimony differed on Mr. Villarce's plans for the machine. He testified that he and Mr.

Narvarec intended to export the machine to Mexico, where they had a buyer in mind. Ms. Parker believed that the two men planned to use the machine in a joint business venture. Because the officers at the airport did not possess this information, however, the point is immaterial to this case.

told him that a Hispanic male had purchased a ticket for himself and a white female.[13] Based solely on this information, Officer Wells and another unknown officer walked to the gate at which the three young people were sitting, approached them, and sat down beside Messrs. Villarce and Narvarec.[14] Officer Wells asked Mr. Villarce for his ticket and identification; Mr. Villarce produced the ticket, a Texas driver's license, and a Social Security card. Officer Wells asked Mr. Villarce where he was going and why; Mr. Villarce responded that he was going to Texas to purchase a shoe repair machine. Officer Wells then turned to Ms. Parker, and asked her for her identification and ticket. Officer Wells saw that she was travelling under the name Linda Villarce, and Mr. Villarce explained that they were married.[15]

Next, Officer Wells asked Mr. Villarce how he intended to pay for the machine; Mr. Villarce responded that he would pay in cash. Officer Wells asked how much cash Mr. Villarce was carrying, but Mr. Villarce refused to tell him, saying: "Who you think you are, asking me these questions?" Officer Wells then explained that he was a police officer investigating drug trafficking, and Mr. Villarce told him that he was carrying $9,000 in cash. Officer Wells asked Mr. Villarce what the small carry-on bag he possessed contained; Mr. Villarce responded that it contained clothes.

Officer Wells asked Mr. Villarce for permission to search the bag; Mr. Villarce granted it, but testified that he felt that had he refused, Officer Wells, nevertheless, would have searched the bag. Officer Wells removed from the bag a large bundle wrapped in an opaque plastic bag, scratched at the plastic to expose the currency it contained, and asked Mr. Villarce how much it contained. Mr. Villarce responded that it was $9,000.

Officer Wells told Mr. Villarce that he would detain the money to conduct further investigations. Officer Wells testified that he invited Mr. Villarce and his companions to return with him to the DIU office, but that they refused. Mr. Villarce and Ms. Parker testified that he did not make this offer, but merely wrote out a receipt by hand on a piece of paper, and handed this along with a business card to Mr. Villarce. Mr. Villarce also testified that he asked Officer Wells to arrest him if he had done anything wrong, and that Officer Wells refused. Officer Wells denies that this occurred.

Mr. Narvarec was unconvinced that the two men were really police officers, and asked to see their badges. They showed their badges, explained to Mr. Villarce that he would have to file a claim for the money, and gave him a business card. Officer Wells then placed the money under his arm and the officers left. Mr. Villarce and Ms. Parker, their purpose now frustrated, cancelled their travel plans.

At trial, Mr. Villarce testified that some of the money came from an acquaintance in Mexico, some of it came from Mr. Narvarec, and $2,500 of it was his own savings which he had earned on jobs as a drywall hanger.

See Record at 526–30 (testimony of Sergeant Byrum); id. at 559–87 (testimony of Mr. Villarce); id. at 588–600 (testimony of Ms. Parker); id. at 614–17, 641–46 (testimony of Officer Wells); Plaintiff's Exhibit 29 (handwritten receipt and Officer Wells's business card); Plaintiff's Exhibit 30 (business card of Bill Pratt, employer of Mr. Villarce); Defendants' Exhibit 36 ("DEA 12" receipt for the currency seized).

22. In December, 1989, Ronardo Stewart, a young African–American man, picked up his cousin Renardo Stewart, arriving for a

---

**13.** Officer Wells initially testified that the informant told him that the Hispanic male had purchased tickets for all three. Upon being reminded that only two of the three were travelling, Officer Wells could not remember precisely what he had been told. The Court's finding on this point is based on Officer Wells's testimony, and the undisputed fact that only Mr. Villarce and Ms. Parker were travelling.

**14.** Officer Wells denied that Messrs. Villarce and Narvarec's Hispanic race played a role in the officers' decision to approach them in the airport.

**15.** The Court observes that it is not uncommon for unmarried men and women travelling together to tell people they encounter that they are married.

visit from his home in Detroit. The cousins left the baggage return area with Mr. Stewart's luggage, and were leaving the terminal building when two unidentified police officers with the DIU approached them and asked to search them and the bags. Ronardo Stewart refused at first, but then agreed after his cousin, who owned the bags, consented. The police searched the bags and the two young men, and told them they were free to leave. See Record at 606–612 (testimony of Ronardo Stewart).

22. The Court takes judicial notice of the fact that in 1991, the racial composition of the population of American adults who had flown on commercial air transportation during the previous twelve months was as follows:

| | |
|---|---|
| White | 87.5% |
| African–American | 5.1 |
| Hispanic | 1.6 |
| Asian | 0.8 |
| Native American | 0.4 |
| Other | 4.6 |

The Gallup Organization, *Air Travel Survey—1991* (1991) (published by Air Transport Association of America).

In the 1990 census, the adult population of the United States consisted of approximately 160,000,000 whites, 22,000,000 African–Americans, and 6,000,000 other minorities. U.S. Bureau of the Census, *Current Population Reports*, Series P–25, No. 1018.

In addition, the Court notes that the Nashville Airport is a "hub" airport for American Airlines.

23. In May, 1991, the DIU began to record the names and flight information of the people whom its members had interviewed or interrogated.[16] The log contains entries for 587 stops (omitting the general references to the Greyhound bus station which lack name entries). Of the names provided to Mr. Jones's attorney under the terms of a protective order, 79 (or 13.46%) appear to be Hispanic surnames, and 10 (1.7%) appear to be Asian.

---

16. The log which the DIU kept contained several entries accompanied by the notation "H/M." The evidence clearly established that this notation referred to agents' encounters with suspects at hotels and motels. In addition to their activi-

*Conclusions of Law*

*General Principles*

1. The civil forfeiture provision of the Controlled Substances Act provides:

The following shall be subject to forfeiture to the United States and no property right shall exist in them:

. . . . .

(6) All moneys ... furnished or intended to be furnished by any person in exchange for a controlled substance in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys ... used or intended to be used to facilitate any violation of this subchapter.

21 U.S.C. § 881(a)(6).

■ 2. Forfeiture statutes are not favored, but "should be enforced only when within both letter and spirit of the law." *United States v. One 1936 Model Ford V–8 De Luxe Coach*, 307 U.S. 219, 59 S.Ct. 861, 83 L.Ed. 1249 (1939). *United States v. $38,000.00*, 816 F.2d 1538, 1547 (11th Cir.1987). They are to be strictly construed against the Government. *United States v. $67,220.00 in U.S. Currency*, No. 3–90–772, memorandum op. at 13 (E.D.Tenn. Feb. 22, 1993).

■ 3. Mr. Jones demonstrated an interest in the currency sufficient to satisfy the Court that he has standing to contest the forfeiture. See *United States v. $364,960.00 in U.S. Currency*, 661 F.2d 319, 326 (5th Cir.1981). Although Mr. Jones admitted at trial that only some of the $9,000.00 originated with him (see Finding 18), and claimed that the remainder came from Mr. Alexander, whether Mr. Jones was Mr. Alexander's agent or his debtor does not affect his standing to challenge the forfeiture. See *United States v. $53,082.00 in U.S. Currency*, 773 F.Supp. 26, 29 (E.D.Mich.1991).

4. The allocation of burdens in a forfeiture proceeding is provided by 19 U.S.C. § 1615, made applicable to forfeitures under the Controlled Substances Act by 21 U.S.C. § 881(d). "[T]he burden of proof shall lie

---

ties at the airport, the agents were instructed to solicit information from employees at hotels and motels in the area of the airport, and from employees at the bus terminal in downtown Nashville.

upon [the] claimant ... *Provided,* That probable cause shall first be shown for the institution of such suit or action, to be judged of by the court...." 19 U.S.C. § 1615 (emphasis in original). To meet its burden, the government "must establish probable cause to believe that a substantial connection exists between the property to be forfeited and the illegal exchange of a controlled substance." *United States v. $67,220.00 in U.S. Currency,* 957 F.2d 280, 283 (6th Cir.1992) (quoting from *United States v. 526 Liscum Drive,* 866 F.2d 213, 216 (6th Cir.1989)).

■ 5. "Probable cause means 'reasonable ground for belief of guilt, supported by less than *prima facie* proof but more than mere suspicion." *526 Liscum Drive,* 866 F.2d at 216. Thus, in a § 881(a)(6) forfeiture proceeding, the government's burden is to establish a reasonable ground for belief, supported by more than mere suspicion, that there is a substantial connection between the seized money and an illegal drug transaction. See *United States v. $53,082 in U.S. Currency,* 985 F.2d 245, 250 (6th Cir.1993); *$67,220.00 in U.S. Currency,* 957 F.2d at 284; *United States v. Four Million Two Hundred Fifty–Five Thousand,* 762 F.2d 895, 903 (11th Cir.1985).

6. The aggregation of facts, each one insufficient standing alone, may suffice to meet the government's burden. To determine whether the information is sufficient, a court must "weigh not the individual layers but the 'laminated' total." *$67,220.00 in U.S. Currency,* 957 F.2d at 284 (quoting *United States v. Nigro,* 727 F.2d 100, 104 (6th Cir.1984)); *United States v. U.S. Currency, $83,310.78,* 851 F.2d 1231, 1235 (9th Cir.1988). The Court must review each piece of evidence separately only to determine its probative weight, and not whether it establishes probable cause standing alone. *$67,220.00 in U.S. Currency,* 957 F.2d at 285; *United States v. Thomas,* 913 F.2d 1111, 1117 (4th Cir.1990).

■ 7. In deciding whether the government has met its burden of establishing probable cause, the Sixth Circuit has held that the Court must consider the evidence existing at the time of the hearing. *$53,082 in U.S. Currency,* 985 F.2d at 250; *$67,*

*220.00 in U.S. Currency,* 957 F.2d at 284. According to these holdings, the Court must consider the entire record of admissible evidence, including evidence developed after the seizure. *Id.* However, the exclusionary rule applies to forfeiture proceedings, because of their quasi-criminal nature, and only legally-obtained evidence may be used to establish probable cause. *$53,082 in U.S. Currency,* 985 F.2d at 250 (citing *One 1958 Plymouth Sedan v. Pennsylvania,* 380 U.S. 693, 702, 85 S.Ct. 1246, 1251, 14 L.Ed.2d 170 (1965)).

■ With all due respect to the Sixth Circuit, this Court disagrees with its holding that the Government may satisfy its burden of establishing probable cause using evidence gained subsequent to the filing of the forfeiture action. See *United States v. $67,220.00 in U.S. Currency,* 957 F.2d 280 (6th Cir. 1992); *United States v. $53,082.00 in U.S. Currency,* 985 F.2d at 250 (6th Cir.1993). This conclusion contradicts statutory language, ignores the substantial differences between the cases before the Court then and the Second Circuit's cases on which the Court relied, and gives an unduly broad effect to a disfavored statute.

The Second Circuit's opinion in *United States v. Property at 4492 S. Livonia Rd.,* 889 F.2d 1258 (2d Cir.1989), on which the Sixth Circuit's holding is based, ignores statutory language which clearly requires the Government to have probable cause at the time it commences a forfeiture suit. Section 1615 of Title 19 of the United States Code, which 28 U.S.C. § 881(d) makes applicable to drug forfeiture proceedings, provides that the burden of proof is cast onto the claimant

> *Provided,* That probable cause shall be first shown <u>for the institution of such suit or action,</u> to be judged of by the court ...

(underlined emphasis added). As the Northern District of California noted in *U.S. v. $191,910.00 in U.S. Currency,* 788 F.Supp. 1090, 1096 (N.D.Calif.1992), the language commands that probable cause exist <u>for the institution</u> of the suit. Thus, evidence obtained subsequent to the filing of the suit should not be considered in determining

probable cause.[17] See also *United States v. $14,500.00 in U.S. Currency,* 767 F.Supp. 1123 (M.D.Fla.1991) (holding that the government may use evidence developed after the seizure, but not that which it developed after the filing of the suit).

The Sixth Circuit's blanket endorsement of the Second Circuit's approach in *4492 S. Livonia Rd.* also ignores the principal distinction between that case, and the two cases before the Sixth Circuit. In *4492 S. Livonia Rd.,* the Government seized assets during the execution of a search warrant issued by a state judge, and based on a showing of probable cause. See *4492 S. Livonia Rd.,* 889 F.2d at 1261. *United States v. $37,780.00 in U.S. Currency,* 920 F.2d 159 (2d Cir.1990). In the cases before the Sixth Circuit, there was no prior independent finding of probable cause to justify the seizure and the subsequent forfeiture suit.

Although *4492 S. Livonia Rd.* is now the law of this Circuit, even that case placed substantial limits on its scope. The Second Circuit stated: "Of course, the government cannot start a forfeiture proceeding in bad faith with wild allegations based on the hope that something will turn up to justify its suit." 889 F.2d at 1268.

By comparing the facts of *4492 S. Livonia Rd.* to those of this case, one can readily see the wisdom of this limitation. In *4492 S. Livonia Rd.,* a confidential informant had arranged a drug purchase. During the execution of the sale, a known drug dealer had gone to the claimant's house and returned with the drugs which the dealer then sold to an agent. Id. at 1261. The post-seizure evidence at issue consisted of statements which the claimant made when he later of-fered a plea to charges of the sale of a controlled substance.

■ This case, however, is best described in the Second Circuit's own language; it is "a forfeiture proceeding [started] in bad faith with wild allegations based on the hope that something [would] turn up to justify [the] suit." Id. at 1268. With hindsight, one is tempted to say that the allegations could not be "wild" when the claimant testifies evasively and appears to be hiding some criminal activity. Nevertheless, if the Second Circuit's limitation is to have any meaning whatsoever, it is that the government may not demonstrate probable cause when, as here, it possessed nothing more than mere suspicion at the time of the seizure, and used the forfeiture suit to discover more information.

*Search and Seizure*

8. There are several steps to evaluating Mr. Jones's argument that the encounter at the airport violated his Fourth Amendment right to be secure against unreasonable searches and seizures. First, the Court must determine if there was a search or a seizure which the Fourth Amendment recognizes. The second question is whether these warrantless acts were nevertheless reasonable under the warrant requirement of the Fourth Amendment. If the acts were not reasonable, the final question is what effect the illegality has upon the evidence produced at trial.

With this framework in mind, the Court next considers the several relevant points at which a search or seizure cognizable under the Fourth Amendment may have occurred. Specifically, the Court considers the officers'

---

**17.** Weighing only the evidence which was available as of the filing of the suit is also consonant with the holding of several courts that a court may consider otherwise inadmissible evidence in passing upon probable cause. (This Court disagrees; see footnote 24). The Supreme Court's acceptance of hearsay in *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978) was premised on the need to make decisions quickly early in the investigative process:

This does not mean "truthful" in the sense that every fact recited in the warrant affidavit is necessarily correct, for probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily.

Id. at 165, 98 S.Ct. at 2681. There is no need to accommodate the Government in this fashion if it has until the time of trial to prepare its case. "Probable cause," as used in the statute, refers to a legal standard, and courts have erred when they have extended criminal holdings into civil forfeitures, which are disfavored. See Conclusion 2.

search of Mr. Jones's person, and the seizure of his currency.[18]

### The Frisk

9. Although the Supreme Court in *Terry v. Ohio,* 392 U.S. 1, 19, 88 S.Ct. 1868, 1878, 20 L.Ed.2d 889 (1968), rejected any "talismanic" interpretation of the concepts of search and seizure, it nevertheless retained, for the purposes of determining the reasonableness of detention, the distinction between a "stop" and a "frisk." See *United States v. Thomas,* 844 F.2d 678, 685 (9th Cir.1988).

The Supreme Court's two-fold holding in *Terry* reflects this distinction between stops and frisks. Under *Terry,* a police officer may detain a person whom he reasonably suspects is involved in criminal activity, and may, without probable cause, frisk the suspect for weapons when he has a reasonable belief that the suspect is armed and dangerous, and poses a danger to the officer or others in the area. The Supreme Court held in *Terry:*

> Our evaluation of the proper balance that has to be struck in this type of case leads us to conclude that there must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. [Citations omitted.] And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or "hunch," but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.

Id. 392 U.S. at 27, 88 S.Ct. at 1883.

The "reasonable belief" standard may be broken down into subjective and objective components: the officer must *in fact* possess a belief that is objectively reasonable, and that cannot be characterized as an "unparticularized suspicion" or "hunch." In *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), the Supreme Court noted the limited public safety purpose for which a frisk could be conducted on less than probable cause:

> The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence, and thus the frisk for weapons might be equally necessary and reasonable, whether or not carrying a concealed weapon violated any applicable state law.

Particularly important in the present case is the Court's admonition in *Adams* that a frisk cannot be conducted merely for the purpose of discovering evidence of crime.

 This Court is mindful that law enforcement officials must exercise great care for their safety and that of others. Nevertheless, where the officer has no belief that the suspect is armed and poses a danger, or where his concern is not objectively reasonable, a frisk impermissibly intrudes into the freedoms protected by the Fourth Amendment. Although it is a very rare case where this Court will doubt a police officer's stated concerns for the safety of himself and others, the Court finds that the frisk in this case fails under both the objective and subjective prongs of the test announced in *Terry.*

Although the officers asserted at trial that they feared that Mr. Jones possessed a weapon which had evaded the metal detector, this Court concludes that this was a mere pretext for the frisk they conducted. The officers waited several minutes into the encounter before they frisked Mr. Jones, and only after they conducted a conversation about money which culminated with Sergeant Byrum asking Mr. Jones: "How many thousands are you carrying or packing on your body?" (See Finding 10.) In light of all the circumstances of this encounter, the Court

---

**18.** The Court found that Mr. Jones voluntarily agreed to accompany the officers to the jetway, and does not, therefore, conclude that Mr. Jones was seized under the Fourth Amendment when the men walked there. See Finding 8, above.

finds that the officers' statements of their concern are not credible. At the time they conducted the frisk, they were simply concerned with discovering evidence, and not concerned with their safety or that of others.[19]

■ Because the officers' frisk of Mr. Jones was unconstitutional, the evidence it produced must be suppressed as the fruits of an illegal search. See *Boyd v. United States,* 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886); *One 1958 Plymouth Sedan v. Pennsylvania,* 380 U.S. 693, 85 S.Ct. 1246, 14 L.Ed.2d 170 (1965). Accordingly, the Court will not consider the fact that Mr. Jones carried the currency on his trip, the amount of currency, the manner in which he carried it, and the way it was packaged. Although the Court cannot refuse to exercise jurisdiction over the currency merely because of the illegal manner in which it was obtained, the Court must not consider the evidence it provides. "An object illegally seized cannot in any way be used as evidence in a forfeiture case." *United States v. $191,910.00 in U.S. Currency,* 788 F.Supp. 1090 (N.D.Calif.1992).

### The Seizure

■ 10. In addition to the unreasonable search of Mr. Jones's person, the Court concludes, based on the credible evidence presented at trial, that Mr. Jones was unreasonably seized in violation of the Fourth Amendment when the officers, in possession of his airline ticket and currency, asked him to accompany them to the Drug Interdiction Unit office.

This case is indistinguishable from *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). In *Royer,* police officers at an airport approached a suspect who fit several characteristics of the "drug courier profile." The officers asked to see his identification and airline ticket. He did not orally consent, but produced them anyway. The officers retained the ticket and identification, informed Royer that they suspected him of transporting narcotics, and asked him to accompany them to a small private room ap-

proximately 40 feet from where the encounter began. Id., 460 U.S. at 493–95, 103 S.Ct. at 1321–23. A plurality of the Supreme Court stated:

> Asking for and examining Royer's ticket and his driver's license were no doubt permissible in themselves, but when the officers identified themselves as narcotics agents, told Royer that he was suspected of transporting narcotics, and asked him to accompany them to the police room, while retaining his ticket and driver's license and without indicating in any way that he was free to depart, Royer was effectively seized for the purposes of the Fourth Amendment.

See also *United States v. $67,220.00 in U.S. Currency,* No. 3–90–772, at 21 (E.D.Tenn. Feb. 23, 1993), and cases cited there.

The Defendants argue that this case differs from *Royer* because the officers, unlike those in *Royer,* did not tell Mr. Jones that they suspected him of narcotics trafficking. This argument is without merit; the inference of suspicion is inescapable in this case. The Defendants first told Mr. Jones that they were investigating the movement of drugs and drug money through the airport. See Finding 10. After discovering the currency, the Defendants told Mr. Jones that they were going to detain his currency for further investigations. See Finding 11.

Furthermore, this case is strikingly similar to the recent Sixth Circuit case of *United States v. $53,082.00 in U.S. Currency,* 985 F.2d 245 (6th Cir.1993). In *$53,082 in U.S. Currency,* two officers approached two claimants as they sat in a departure area at the Detroit Metropolitan Airport, waiting to board a flight to Dallas. One appeared nervous to the officers; each had a small carry-on bag and had checked no luggage. They permitted the officers to inspect their tickets, which were purchased with cash that same day, and which called for a return flight the next day. The claimants consented to a search of their carry-on bags at the gate area. While the officers performed this

---

**19.** Even assuming that the officers believed that Mr. Jones may have been armed and dangerous, the facts that he had already passed through a metal detector, and that his carry-on bag had been searched, cast a substantial doubt on the objective reasonableness of such a belief.

search, the claimants disclosed that they carried $45,000 in their socks. The officers returned the tickets and identification, and told the claimants that they were not under arrest. The claimants agreed to accompany the officers to their office and show them the money there. When they did, the officers told the claimants that they were going to hold the currency in order to present it to a narcotics detection dog. Id. at 247.

■ The Sixth Circuit held that the officers' telling the claimants that they were going to detain the money for the purpose of presenting it to the dog was a "meaningful interference" with the property, and constituted a seizure. Because their statement was not a request, there was no consent. Because the currency was seized from the claimant's person, in which the claimants had a high expectation of privacy, probable cause was necessary to justify the seizure. Probable cause was lacking in the case, however, because the mere fact that a traveller matches some elements of the drug courier profile does not amount to even articulable suspicion, much less probable cause. See id. at 249–50.

This case presents even more egregious facts than does *$53,082.00 in U.S. Currency*. In Mr. Jones's case, the officers' discovery of the currency was the product of an illegal frisk, the officers seized the currency on the concourse itself, and never told Mr. Jones that he was not under arrest (in fact, he believed that he would be arrested). In all other relevant respects, the cases are indistinguishable.[20] Like the claimants in *$53,082 in U.S. Currency*, Mr. Jones had purchased a round trip ticket for cash to an alleged source city for drugs. Like them, he appeared nervous in the departure lounge, travelled under his own name, and had noth-

ing suspicious in his carry-on bag. As in *$53,082 in U.S. Currency,* the officers in this case illegally seized Mr. Jones's currency without probable cause.

The evidence is absolutely clear that Mr. Jones's remarks after leaving the jetway were "not the result of an independent act of free will." He continued to speak to the officers solely to satisfy their suspicions. Upon realizing that his responses were not satisfying the officers, Mr. Jones declined to answer their specific questions. Mr. Jones may also have been motivated to speak because of his suspicions that the officers intended to steal his money. See Record at 314–315 (testimony of Mr. Jones).[21]

Because Mr. Jones's presence subsequent to the officers' seizure of his currency and airline ticket was illegal, his remarks and responses are inadmissible to determine probable cause. "[S]tatements given during a period of illegal detention are inadmissible even if voluntarily given if they are the product of the illegal detention and not the result of an independent act of free will." *Royer,* 460 U.S. at 501, 103 S.Ct. at 1326; see also *$53,082 in U.S. Currency,* 985 F.2d at 250 (citing *One 1958 Plymouth Sedan v. Pennsylvania,* 380 U.S. 693, 702, 85 S.Ct. 1246, 1251, 14 L.Ed.2d 170 (1965)). In addition, the dog sniff is suppressed as the fruit of this unreasonable search. See *$53,082.00 in U.S. Currency,* 985 F.2d at 250.

#### The Dog Sniff

■ 11. Even assuming that the frisk and seizure of Mr. Jones's person were within the bounds of the Fourth Amendment, as a growing chorus of courts are finding, the evidence of the narcotic-trained dog's "alert" to the currency is of extremely little proba-

---

20. Although the Court has held that it may not consider the amount of the currency in assessing whether the Defendants have proven probable cause for the institution of the forfeiture action (see Conclusion 9), many of these forfeiture cases can be distinguished in Mr. Jones's favor on the basis of the amount of currency. Where a relatively small amount of money is found, courts have been less willing to find probable cause justifying forfeiture. See *United States v. $100,-000*, 761 F.Supp. 672, 676 (E.D.Mo.1991), and cases cited there. In the world of currency for-

feiture, the $9,000 discovered on Mr. Jones is a minor sum. See cases cited at id.

21. Mr. Jones stated at trial: "Well, I felt like at that time regardless of what I told them, he was not going to believe anything else I said. I had showed him that I had—I had told I was in the business. I had, I think at that time or later, I had even presented to him a business card. I just didn't feel like it was no use of me going any further and explain it on their terms." Record at 315.

tive weight. See *United States v. $53,082 in U.S. Currency,* 985 F.2d at 250, n. 5 (6th Cir.1993) (stating that "[e]ven if it could be considered, the evidentiary value of a narcotics detection dog's alert has recently been called into question"); *United States v. $53,082.00 in U.S. Currency,* 773 F.Supp. 26, 34 (E.D.Mich.1991); *United States v. $639,558.00 in U.S. Currency,* 955 F.2d 712 (D.C.Cir.1992); *United States v. $80,760.00 in U.S. Currency,* 781 F.Supp. 462, 475–77 (N.D.Tex.1991) (and cases cited therein); but see, for the contrary holding, *United States v. $67,220.00 in U.S. Currency,* 957 F.2d 280, 285 (6th Cir.1992); *People v. Sommer,* 12 Cal.App.4th 1642, 16 Cal.Rptr.2d 165 (Cal.Ct. App.1993).

As the Drug Enforcement Administration's own chemists reported in the memorandum of the results of their experiments (admitted at trial in this case), currency in general circulation in this country is contaminated with traces of narcotics. Specifically, the chemist found that one-third of the bills in a randomly selected sample were contaminated with between 2.4 and 12.3 nanograms of cocaine per bill. See Finding 14; Plaintiff's Exhibit 18, at 3. The belts used at Federal Reserve Banks to sort currency were contaminated with approximately 200 nanograms of cocaine per belt. Id. This evidence merely echoes that which has come to the attention of other courts. See *$53,082 in U.S. Currency,* cited above, 985 F.2d at 250, n. 5 (quoting *Dirty Money,* United States Banker, October 1989, at 10, which discussed a study by Lee Hearn, Chief Toxicologist for Florida Dade County Medical Examiner's Office, in which he found that 97% of the bills from around the country tested positively for cocaine, and noting that clean bills are contaminated in banks when they come in contact with contaminated ones); *$639,558.00 in U.S. Currency,* 955 F.2d at 714, n. 4 (citing *Crime and Chemical Analysis,* 243 Science 1554, 1555 (1989), which described the same study and stated that the contaminated bills

carried an average of 7.3 micrograms of cocaine per bill); *United States v. $83,375 in United States Currency,* 727 F.Supp. 155, 160 (D.N.J.1989) (describing testimony of Jay Poupko, Ph.D., who found in a study that 96% of the bills in circulation were contaminated); *$80,760.00 in U.S. Currency,* 781 F.Supp. at 475–76, n. 32 (quoting a newspaper article describing the results of a study at National Medical Services in Willow Grove, Pennsylvania—80% of the bills tested were contaminated). Although the studies disagree with respect to the percentage of bills contaminated (between one-third and 97%), and with respect to the amount of cocaine residue per bill (between 2.4–12.3 nanograms and 7.3 micrograms),[22] it cannot be doubted that contaminated currency is widespread.

It cannot be doubted that a narcotics detection dog's sense of smell is quite keen. Other courts have observed that a dog can detect narcotics even in the microscopic quantities in which it is present on contaminated currency. See *$639,558.00 in U.S. Currency,* 955 F.2d at 714, n. 2 (stating that "Dr. Woodford testified that, as a result, bills may contain as little as a millionth of a gram of cocaine, but that is many times more cocaine than is needed for a dog to alert. Officer Beard related that 10 percent of the alerts he had witnessed were to cash alone."); *Sommer,* cited above (quoting a dog's trainer as stating that a dog can detect scents in parts per trillion).[23]

The presence of trace narcotics on currency does not yield any relevant information whatsoever about the currency's history. A bill may be contaminated by proximity to a large quantity of cocaine, by its passage through the contaminated sorting machines at the Federal Reserve Banks, or by contact with other contaminated bills in the wallet or at the bank. Compare *$80,760.00 in U.S. Currency,* 781 F.Supp. at 476; *$53,082.00 in U.S. Currency,* 773 F.Supp. at 34 (stating

---

**22.** A nanogram is one-billionth, or $1 \times 10^{-9}$, of a gram. A microgram is one-millionth, or $1 \times 10^{-6}$, of a gram. The range of results is, therefore, quite wide: 7.3 micrograms is roughly 3,000 times greater than 2.4 nanograms.

**23.** Officer Perry's testimony, that Dakota requires one-half of a gram of cocaine to alert, is entirely unpersuasive. He also admitted that Dakota had alerted before to microscopic quantities of the drugs to which he is trained to alert. See Record at 429–31.

that although the positive dog alert "links the currency to controlled substances, it does not link the *claimant's* use of the defendant currency to controlled substances).

Given these facts, the continued reliance of courts and law enforcement officers on dog sniffs to separate "legitimate" currency from "drug-connected" currency is logically indefensible. It is one thing to base probable cause to search a closed container with unknown contents on evidence of a dog's alert; after all, the dog's alert signals the presence of narcotics, though they may be present only as residue on currency which does not merit prosecution. But see *$639,558.00 in U.S. Currency*, 955 F.2d at 714, n. 2 (stating that if the stories on contamination proved accurate, "a court considering whether a dog sniff provides probable cause may have to take into account the possibility that the dog signalled only the presence of money, not drugs." (citation omitted)). It is quite another thing, however, to infer guilt from an alert on an object whose macroscopic characteristics are known to the officer at the time it is presented to the dog. The Court concludes, therefore, that even were it admissible, the probative value of the dog's alert is microscopic.

*Probable Cause*

██ 12. Having determined the scope of admissible evidence, the Court next turns to the threshold question of whether the Government has met its burden of establishing probable cause for the institution of its forfeiture suit. Upon consideration of all admissible evidence (and even considering that evidence which the Government obtained subsequent to its filing of the forfeiture suit), the Court concludes that the aggregate of facts, considered together, do not amount to "a

reasonable ground for belief of guilt, supported by less than prima facie proof but more than mere suspicion." *United States v. $22,287.00 in U.S. Currency*, 709 F.2d 442, 446 (6th Cir.1983); *United States v. $53,082.00 in U.S. Currency*, 985 F.2d 245, 250 (6th Cir.1993).

The admissible evidence in this case can be summarized as follows:

1. Mr. Jones purchased a round-trip ticket to Houston (an alleged "source city" for narcotics) with cash, and with reservations giving him a short lay-over in Houston.

2. Mr. Jones appeared nervous at the airport.

3. Mr. Jones carried a small overnight bag and checked no luggage.

4. Subsequent to the seizure, Mr. Jones offered an explanation for his actions which is unpersuasive and not credible.

5. Mr. Alexander, an associate of Mr. Jones, travelled to Houston two weeks before Mr. Jones's planned trip.

6. Mr. Gentry, another associate of Mr. Jones, heard a rumor that Mr. Alexander had been involved with narcotics.

7. The current husband of the person whom Mr. Jones intended to visit in Houston was, subsequent to the seizure and before his marriage, arrested on narcotics charges.[24]

8. The phone number subsequently belonging to the person whom Mr. Jones intended to visit in Houston had shown up on a pen register trace during a narcotics investigation.

The Government bears the burden of demonstrating probable cause that the property bears a substantial connection to the criminal activity proscribed by the statute, and not

---

**24.** Items six and seven on this list constitute evidence which is inadmissible under the Federal Rules of Evidence as character evidence offered to show action in conformity therewith. See Rule 403, 608(a)(1). Although several federal courts have held that the Government may offer otherwise inadmissible evidence during a probable cause hearing, this Court disagrees. See, for example, *United States v. One 56–Foot Yacht Named Tahuna*, 702 F.2d 1276, 1283 (9th Cir. 1983).

As stated above, forfeiture statutes are to be strictly construed against the Government, and

there is nothing in the statute to suggest that Congress intended to relax the Federal Rules of Evidence for the Government's benefit in forfeiture proceedings. See Conclusion 2.

Indeed, when Congress intended such a result, it knew precisely how to do so. See, for example, 21 U.S.C. § 853(e)(3), which governs protective orders for criminal forfeitures, and provides:

(3) The court may receive and consider, at a hearing held pursuant to this subsection, evidence and information that would be inadmissible under the Federal Rules of Evidence.

just probable cause that the property relates to any criminal activity. *United States v. $38,600 in U.S. Currency,* 784 F.2d 694, 698 (5th Cir.1986), is instructive in this case. In *$38,600 in U.S. Currency,* the Fifth Circuit held that the proximity of $38,600 (wrapped in bundles) to drug paraphernalia, plus the claimant's "persistent evasiveness and inconsistency" gave rise, perhaps, to probable cause of "some illegal activity," but did not provide probable cause that the claimant had "furnished, intended to furnish, or had received the money *in exchange for drugs.*" Id. As in this case, there was no evidence that the claimant had ever been involved in or was suspected of being involved in narcotics transactions.

*$38,600 in U.S. Currency* demonstrates that merely incidental evidence regarding drugs does not rise to the level of probable cause of a substantial connection, even where the claimant's proposed story would fall far short of satisfying the Court that the currency had an innocent source and purpose. See also *United States v. $3,550.00,* 684 F.Supp. 1026 (E.D.Mo.1988) ($3,550 was discovered in possession of claimant who had been previously convicted of drug offenses; the court held that the evidence was inadequate to support a finding of probable cause). As in *$38,600 in U.S. Currency,* the evidence here with respect to drugs is inadequate. Looking at the individual items (before turning to their "laminated" total), only four suggest a connection with drugs: Mr. Jones's destination; the rumor about Mr. Alexander; Ms. Roberts–Johnson's husband's narcotics arrest; and her phone number's appearance on a pen register list.

Each of these items lacks significant probative weight. As the Sixth Circuit has recently held, travel to a source city—even when accompanied by conspicuous nervousness and the absence of checked baggage—does not rise to the level of probable cause. See *United States v. $53,082.00 in U.S. Currency,* 985 F.2d 245, 247, 251 (6th Cir.1993) (claimants planned to travel to Dallas, an alleged "source city"). Even assuming that the rumor about Mr. Alexander is admissible,

it apparently is second-hand hearsay about an associate of the claimant and contained no information about the degree of Mr. Alexander's alleged involvement with drugs. Similarly, even assuming that Mr. Johnson's conviction is admissible, Ms. Roberts–Johnson testified that at the time of the seizure, she and her future husband were undergoing difficulties in their relationship. The Government has offered no proof to support its contention that Mr. Jones intended to visit Mr. Johnson, that Mr. Johnson was engaged in February in the activities for which he was arrested in July, or that Mr. Johnson had contacts with Mr. Jones, Mr. Alexander, or even Ms. Roberts–Johnson at the times relevant to this case. At best, the conviction is character evidence relating to a friend of Mr. Jones's friend; the link to Mr. Jones is far too attenuated to carry meaningful probative weight.[25] Finally, the appearance of Ms. Roberts–Johnson's phone number on a pen register trace in a narcotics investigation adds little more. The Government offered no proof that, at the time the pen register trace was conducted, the number belonged to Ms. Roberts–Johnson; nor did the Government possess information regarding the substance of the conversations. There is no evidence whatsoever that Ms. Roberts–Johnson was implicated in drug offenses.

With "plies" as thin as these, it is not surprising that the "laminated" total is also insubstantial. The aggregation of these pieces of evidence amount to little more than mere suspicion that Mr. Jones was engaged in drug activity.

The Northern District of Texas has provided a useful framework for analyzing forfeiture cases, which at first glance appear to present myriad and contradictory facts and holdings. *United States v. $80,760.00 in U.S. Currency,* 781 F.Supp. 462 (N.D.Tex.1991). The Court observed:

> Drug-related forfeitures can be divided into three categories: (1) close proximity cases where officers find the property with illegal drugs or determine through investigation that it is very closely related to illegal drug dealing; (2) cases relying on

---

**25.** The Court also observes that Mr. Johnson had been convicted of offenses unrelated to narcotics

(e.g., credit card abuse). See Government's Exhibit 33F (criminal history of Mr. Johnson).

less persuasive evidence that is sufficient under the totality of the circumstances; and (3) cases improperly relying on mere suspicion. The instant case falls into the third category.

Id. at 472. In the second category the Court placed cases which involved the following additional circumstances:

1. Corroboration of an informant's tip
2. Testimony of witnesses regarding a drug connection
3. Presence of drug paraphernalia
4. Use of an alias to deceive law enforcement
5. Discovery of records documenting drug transactions
6. Admissions of the claimant or others

Id. at 474 (citations omitted). These corroborating circumstances are conspicuously absent in this case. The Court concludes that the Government's case here also falls into the third category described above, and impermissibly relies on mere suspicion.

The Government has failed to demonstrate the existence of probable cause to believe that the currency they seized at the airport bore a substantial connection to drug offenses. The Court is deeply troubled by the inadequacy of Mr. Jones's story about his intended trip to Houston, but there is scant evidence to support the Government's assertion that his trip was related to drugs. Although his evasion suggests that he harbored some secret purpose, the Government must show more than this, and they have conspicuously failed to do so, even when one takes into account the evidence they gathered through the final day of the trial itself.

*Racial Discrimination by the DIU*

13. The Court finally turns to Mr. Jones's claim that he was targeted for investigation because of his race, and to his request for injunctive relief against the DIU. The Court is deeply troubled by much of the evidence which Mr. Jones presented on this point. It is clear from the testimony that DIU officers approached Mr. and Mrs. Carter because of their race, and—as in Mr. Jones's case—used the pretext of airport security and an exaggeration of normal body contours to justify their invasion of privacy. Even more troubling to this Court is Officer Wells' admission that the sole basis for his investigation of Mr. Villarce and his companions was the knowledge that two hispanic men were travelling in the company of a white woman, and that one of them had purchased two airline tickets. The search of Messrs. Renardo and Ronardo Stewart is also difficult to explain except as the product of constitutionally impermissible racial targeting.

 This Court agrees with Judge Keith of the Sixth Circuit that although police officers are free to approach and ask to speak to citizens, they may not base their decisions to investigate individuals on the basis of race. See *United States v. Taylor,* 956 F.2d 572, 582 (6th Cir.1992) (en banc, Keith, J., dissenting). The isolated voluntary questioning of a citizen belonging to a racial minority does not amount to a Constitutional violation, but the discriminatory investigation of citizens on the basis of race certainly violates the Equal Protection Clause of the Fourteenth Amendment, engenders distrust of law enforcement officials, and perpetuates the perception among minority citizens that they are second-class citizens, and are likely to be suspected of wrongdoing solely because of their race or ancestry.

 Although these incidents substantiate Mr. Jones's claims that DIU officers make investigative decisions on the basis of race, there is insufficient proof that the officers' investigation of Mr. Jones himself was racially motivated. The officers based their decision to investigate Mr. Jones on a number of factors, including the characteristics of his ticket and his method of purchasing it, and his apparent nervousness. The officers learned of these factors through a third party. In short, although the search and seizure violated his Fourth Amendment rights, Mr. Jones has not demonstrated to the Court's satisfaction that he personally is the victim of a discriminatory investigation.

This case differs fundamentally from *McElrath v. Goodwin,* 713 F.Supp. 299 (E.D.Ark.1988), on this threshold question of liability to the plaintiff. *McElrath,* unlike this case, was a class action, and the defendants there had entered a consent decree.

The Court concludes, therefore, that although the DIU's actions at the airport raise substantial equal protection concerns (in addition to the Fourth Amendment violations which were proven in this case), this case does not offer an appropriate vehicle for remedying them.

The Court also observes that the statutory scheme as well as its administrative implementation provide substantial opportunity for abuse and potentiality for corruption. DIU personnel encourage airline employees as well as hotel and motel employees to report "suspicious" travellers and reward them with a percentage of the forfeited proceeds. The forfeited monies are divided and distributed by the Department of Justice among the Metropolitan Nashville Airport and the Metropolitan Nashville Police Department partners in the DIU and itself. As to the local agencies, these monies are "off-budget" in that there is no requirement to account to legislative bodies for its receipt or expenditure. Thus, the law enforcement agency has a direct financial interest in the enforcement of these laws. The previous history in this country of an analogous kind of financial interest on the part of law enforcement officers—i.e., salaries of constables, sheriffs, magistrates, etc., based on fees or fines—is an unsavory and embarrassing scar on the administration of justice. The obviously dangerous potentiality for abuse extant in the forfeiture scheme should trigger, at the very least, heightened scrutiny by the courts when a seizure is contested.

## IV

For the aforementioned reasons, the Court concludes that the Government has failed to meet its burden of proving probable cause for the institution of the forfeiture suit, and orders the Government to restore $9,000.00 to Mr. Jones. Mr. Jones's request for injunctive relief against the DIU is denied.