**Mark William McELRATH, on behalf of himself and all others similarly situated, Plaintiffs,**

**v.**

**Col. Tommy GOODWIN et al., Defendants.**

**No. LR–C–87–255.**

United States District Court, E.D. Arkansas, W.D.

Aug. 24, 1988.

John Wesley Hall, Hall & Vaught, A. Wayne Davis, Arthur L. Allen, Little Rock, Ark., for plaintiffs.

Jim Reierson, Asst. Atty. Gen., Little Rock, Ark., for Tommy Goodwin, Frank Tappin, Keith Eremea and Ken McFerrin.

Bill Luppen, Little Rock, Ark., for Tommy Goodwin.

## ORDER

EISELE, Chief Judge.

Before the court is a motion to show cause filed by several class members in this case. On February 8, 1988, the parties to this action entered into a Consent Decree in settlement of this matter. This case involves various alleged practices of the Arkansas State Police, particularly officers assigned to the Criminal Apprehension Program ("CAPS officers"), which the plaintiffs claim violate the Fourth Amendment. The Consent Decree was designed to remedy the alleged violations. However, the parties interpret the decree differently, and the plaintiffs allege that the State Police have merely continued those practices challenged in the law suit despite the existence of the Consent Decree.

The Consent Decree states in relevant part:

The parties to this case enter into the following Consent Decree:

1. The Arkansas State Police will adopt a policy within 30 days that specifically addresses the following issues:

(a) Vehicles or drivers or passengers shall not be stopped or detained on less than probable cause or by pretext.

(b) A traffic stop cannot be used to question or detain the driver and occupants of a vehicle without reasonable suspicion of criminality.

(c) Reasonable suspicion cannot be used to detain a person longer than fifteen minutes. A.R.Crim.P. 3.1.

(d) Officers shall be advised of and ordered to comply with the Arkansas "stop and detain" law. Ark.Code Ann. s.s. 16–81–201; 16–81–209; A.R.Crim.P. 3.1–3.2.

(e) Evidence or property cannot be seized from a vehicle or person without probable cause to believe that the evidence is contraband or evidence of a crime.

(f) A vehicle consent search form will be adopted in both English and Spanish in substantially the form appended to this order, providing at least:

(1) The driver or person in apparent control shall be told of the right to refuse, limit, or revoke consent.

(2) The driver or person in apparent control shall be told that they will be allowed to go on their way if consent is denied.

(g) No coercion, express or implied, will be used to gain consent. (For example, motorists shall not be told they should cooperate with officers, that things will go or be easier if they consent, that a warrant will be obtained if they do not consent (unless there actually is probable cause), that they will be detained or will be taken elsewhere if they do not agree to a search, etc.).

(h) A general consent to search a car does not grant an officer consent to search all places or containers in the vehicle.... Consent to search all of a vehicle and all its contents must be specific or it is not voluntary.

(i) The Arkansas State Police will also distribute *Miranda* warning cards and forms in English and Spanish to all officers.

2. The policy will include a statement that any officer violating the policy is subject to personal civil liability (e.g., Ark.Code Ann. s. 16–81–208) and professional discipline.

3. Supervisory personnel of the Arkansas State Police are responsible for line officers knowing about and following the policy.

On May 25, 1988, this court conducted a show-cause hearing at which various officials of the Arkansas State Police testified. The defendants admitted that consent to search forms were not distributed in compliance with the Consent Decree. It appeared that on the date of the hearing, almost three months after the date specified in the decree, the forms had not yet reached all of the officers in the State Police. The defendants offered little by way of justification for this failure to comply. They stated "The failure to comply has not in any way been intentional, wilful or wanton but occurred as a result of internal miscommunications and new staff as-

signments." They urged the court to allow them more time and stated that distribution was progressing. Moreover, all line officers had not yet received training as to the meaning and ramifications of the decree. The training sessions given to some officers, principally the CAPS officers, appear to the court to have been cursory in nature. Apparently, the officers were given the decree and read it with little or no discussion as to its effect, if any, on existing policy. As of the date of the hearing, the defendants stated that they planned, within the following 30 days, to conduct training sessions for all line officers in the state.

Of more concern to the plaintiff class members was the apparent continuation of the policies initially challenged by this law suit. The plaintiffs alleged that State Police officers were using a form of the "drug courier profile" to detain and search out-of-state drivers without probable cause or reasonable suspicion. The class members alleged that in violation of the Consent Decree and of the Fourth Amendment the State Police continued such practices after March 8, 1988.

After hearing the evidence, the court concludes that officers of the State Police have violated the decree. At the hearing, several Plaintiffs testified as to their experiences. Each of these Plaintiffs had been stopped by Trooper John Scarberough, a CAPS officer. It was conceded that Trooper Scarberough knew of, and had read the Consent Decree at the time he made the stops in question. Trooper Scarberough testified as to the circumstances of each stop.

The plaintiffs allege that Trooper Scarberough violated the Consent Decree in several respects. First, they allege that Trooper Scarberough stopped their vehicles on less than probable cause in violation of paragraph 1(a). Second, they claim that the stops in question were pretextual in violation of paragraph 1(a). Third, they claim that after the reason for the traffic stop had ended, i.e. a ticket or a warning had been given, Trooper Scarberough interrogated them as to matters unrelated to the traffic stop. They contend that this tactic

was employed to generate probable cause or reasonable suspicion upon which to base a search. Fourth, they allege that the detentions in question were of an unreasonable length, in excess of 15 minutes, in violation of paragraph 1(c).

■ Initially, the court holds that the defendants violated the Consent Decree by failing to distribute all relevant materials in a timely fashion. Testimony at the hearing indicated that new consent to search forms and Spanish language *Miranda* forms were not distributed until April 19, 1988, approximately one month late. Copies of the new Arkansas State Police Policy and of the Consent Decree were not distributed until May 24, 1988, one day before the hearing and approximately two months late. Moreover all the officers had not been trained as of the date of the hearing; therefore State Police will be at least two months late in training line officers. Colonel Goodwin, the director of the State Police, admitted "we goofed". The court holds that the State Police have violated the decree despite their allegations of good faith. Colonel Goodwin testified that due to numerous retirements, a staff shortage occurred at the State police, causing delays in implementation of the decree. The court notes that the State Police could have moved the court for an extension of time in which to comply. Given that they did not do so, the court must find at least a technical lack of compliance. Any other finding would condone the apparent view of State Police officials that compliance with the decree was not a priority matter.

After considering the evidence from the May 25th hearing, the court concludes that Trooper Scarberough did not stop the class members in question without probable cause. In each case discussed at the hearing, the class member had committed some traffic offense which would justify a limited-purpose traffic stop. However, the court concludes that Trooper Scarberough proceeded beyond the bounds of the limited intrusion which may, under the consent decree, accompany such a traffic stop.

■ First, Trooper Scarberough questioned occupants of vehicles he had stopped as to matters unrelated[1] to the offense at issue. For example, he asked both drivers and passengers where they were going. Trooper Scarberough admitted that he did not always question individuals he had stopped as to such unrelated matters. He was unable to explain why he sometimes asked such questions and why he sometimes did not. Defendants argued that such questions only arose out of courtesy, but the plaintiffs contended that inconsistencies or irregularities in the answers to such questions were routinely used to generate reasonable suspicion resulting in further detention and questioning.[2]

The court concludes that the questioning of drivers and passengers as to matters completely unrelated to the reason for the traffic stop (e.g. destination of trip) violated paragraph 1(b). Trooper Scarberough used the occasion of the traffic stop to question the occupants of these vehicles without reasonable suspicion; it does not matter that the questioning appeared to be innocuous. Given the fact that the answers to such questions were admittedly used in an investigatory manner to pursue

---

1. The court need not define precisely what kinds of questions would be related to a traffic stop. In the cases described by the class members, it is clear that the questioning was not related to the traffic offense. For example, Trooper Scarberough inquired as to the plans of drivers and passengers upon reaching their destinations. The court cannot conceive of the relationship that such questions would bear upon a stop for speeding or erratic driving. Moreover, Trooper Scarberough apparently conceded that the questions bore little or no relation to the stop. Indeed, his only suggested justification was that he asked such questions out of courtesy.

2. The court observes that inconsistent answers to such questions would not necessarily give rise to reasonable suspicion of criminal activity. In one case discussed at the hearing, one occupant stated that he was going to visit friends, while the other said that he was going of see his daughter. Nothing about these answers suggests any involvement in criminal activity. The unreliability of comparing these types of answers and the non-uniformity of the use of such questions suggest that using a traffic stop as a means to ask them would violate paragraph 1(b) of the Consent Decree.

other possible criminal activities, it is difficult to see how they differ from any other investigatory question. In addition, paragraph 1(b) refers to "questioning" with no distinction between questions that are innocuous and those that are not.

Second, it appears to the court that Trooper Scarberough may have made pretextual stops in violation of paragraph 1(a). The fact that such questioning was admittedly used in only some cases suggests that the stops of at least some of the class members may have been pretextual. In other words, circumstantial evidence suggested that Trooper Scarberough may have made the traffic stop for the purpose of investigating the occupants of vehicles as to possible crimes other than traffic offenses. This conclusion is supported by the fact that in some cases Scarberough asked his questions for reasons that even he could not explain. In other cases, he claimed to have discovered evidence of criminal activity, e.g., he stated that he smelled marijuana. In the latter situation, the problem of pretext does not arise because the stated circumstance tends to negate the inference that Trooper Scarberough made the traffic stop with an investigatory purpose in mind.

■■■ The court also notes that no probable cause existed as to passengers in the vehicles in question. Unlike the drivers, the passengers had committed no observed offense,[3] and the questioning of them would therefore violate paragraph 1(a) because the police committed an intrusion, albeit a limited one, beyond that necessary for a traffic stop of the driver. It is true that a traffic stop of a vehicle containing passengers entails a detention of the passengers with out probable cause to believe

that they have committed any crime. *Cf Michigan v. Summers*, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981) (upholding the detention of occupants in a home during the execution of a search warrant). However, the further intrusion of questioning passengers, and keeping their identification after examination of it, constitutes further intrusion without probable cause in violation of paragraph 1(a) of the Consent Decree. *See Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (holding by drug enforcement agents of a suspect's drivers license and airline tickets held to be a seizure for Fourth Amendment purposes because the suspect would not believe that he was free to leave before his papers had been returned to him). Therefore, the court concludes that violations of paragraphs 1(a) & (b) of the Consent Decree have occurred. In addition, the detentions and interrogations discussed above appeared to have resulted in detentions in excess of 15 minutes in violation of paragraph 1(c).

The defendants argue that a strict interpretation of the Consent Decree would severely limit their ability to investigate criminal activity in Arkansas. At the outset, the court would remind the defendants that the parties themselves agreed to the Consent Decree and should not now complain about their own language. Moreover, "there is nothing new in the realization that the Constitution sometimes insulates the criminality of a few in order to protect the privacy of us all." *Arizona v. Hicks*, 480 U.S. 321, 107 S.Ct. 1149, 1155, 94 L.Ed.2d 347 (1987).

■■■ The court notes that State Police officers may use several investigatory techniques and still comply with this Consent

---

**3.** Trooper Scarberough appeared to believe that the foreign appearance of some drivers and passengers gave him reasonable cause to believe that they were illegal aliens. In one case, a suspect showed Scarberough a valid New York drivers license and stated that he was a United States citizen. Nevertheless, Scarberough claimed that his failure to produce a green card provided reasonable suspicion. The court would caution the State Police against reliance on "foreign appearance" alone to justify investigatory detentions. *See United States v. Brigno-*

*ni–Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) (mexican appearance even in close proximity to the border was not sufficient to justify reasonable suspicion of illegal status). If Trooper Scarberough's notion that failure of a person, who appeared to be of foreign descent, to produce a green card constitutes reasonable cause, were credited, it is difficult to imagine how United States citizens fitting this description could enjoy their civil rights to the same extent as other citizens.

Decree. First, officers may rely upon evidence which is in plain view. When a car is lawfully stopped for a traffic violation, a mere viewing of the interior does not even constitute a search. *New York v. Class,* 475 U.S. 106, 106 S.Ct. 960, 89 L.Ed.2d 81 (1986); *See also Texas v. Brown,* 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502. A similar analysis applies to an officer's detection of odors such as the odor of marijuana; the plain view doctrine applies to all sensory impressions gained by an officer who is legally present in the position from which he gains them. The Fourth Amendment is only implicated in plain view searches which require officers to go to great lengths, e.g., peering through a penny sized crack with a flash light. 1 W. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment,* s. 2.5(c) (2nd Ed.1987).

■■■ If, through the use of legitimate investigatory means, an officer develops probable cause, he may conduct a warrantless search of an automobile he has stopped. A search must be properly limited in scope and intensity to correspond with the probable cause obtained by the officer. *See Burkett v. State,* 271 Ark. 150, 607 S.W.2d 399 (1980) (roach clip and marijuana cigarette butt in ashtray "did not supply the probable cause required for a warrantless search of the contents of the locked trunk of the car"); *Scisney v. State,* 270 Ark. 610, 605 S.W.2d 451 (1980) (Several marijuana cigarettes found in the passenger compartment of the vehicle do not supply the probable cause required for a search of two sealed suit cases in the locked trunk of the car.).

■■■ Finally, officers may search vehicles they have stopped if they properly obtain consent. They must, however, follow the provisions of the Consent Decree using the new consent to search form specified therein. The court notes that the decree would appear to prohibit searches for which the officer has not obtained a

signature on the consent form. In one case discussed at the hearing, Trooper Scarberough stated that one of the plaintiff class members had given oral consent but had refused to sign the consent form. The court concludes that the intent of this decree was to eliminate the inevitable swearing contests which will result if officers are not required invariably to use the consent to search forms. The court has discussed the devices available to the State Police in an effort to demonstrate that compliance with the decree voluntarily entered into by the State Police will not bring legitimate law enforcement efforts to an end. Rather, compliance should encourage legitimate police investigation and reduce the number of questionable searches and seizures. However, if the defendants, upon mature reflection, conclude that the Consent Decree to which they agreed inhibits legitimate police work, they are free to petition the court for a modification thereof. However, unless and until modified, the Consent Decree must be obeyed.

■■■ Having concluded that the Consent Decree has been violated, the court must fashion an appropriate sanction. First, as was noted at the hearing, the court believes that suppression by it of evidence obtained in violation of the decree would be improper. If this court were to undertake independent consideration of every seizure by the Arkansas State Police, it would unjustifiably encroach upon the autonomy of both state and federal judges. In making this ruling, this court does not express an opinion as to whether violation of the Consent Decree (as opposed to Constitutional violations [4]) should invoke the Exclusionary Rule. Class members are free to argue this point in their individual suppression hearings.

Second, the court believes that fines are appropriate in this case. It will therefore impose a fine of $500.00 on Colonel Tommy Goodwin for violation of paragraph 3 of the Consent Decree which states that "Supervi-

---

4. The court does not wish to imply that violations of any particular paragraphs of the Consent Decree may not also be Fourth Amendment violations. However, it has noted the difference between the two in an effort to clarify its position that it should not order the suppression of evidence offered before other state and federal judges.

sory personnel of the Arkansas State Police are responsible for line officers knowing about and following the policy." Further, the court will impose a fine of $100.00 on Trooper John Scarberough for failure to follow the decree, the contents of which were known to him. These modest fines are deemed appropriate in the first test of the effect of the Consent Decree. Such leniency, of course, could not be expected for future violations.

Finally, the court adopts the suggestion of the plaintiffs that a neutral person should conduct a training program as to the use of and the meaning of the Consent Decree. It does not appear to the court that the training given to the CAPS Officers was adequate. Had it been so, the need for these contempt proceedings might never have arisen. It is possible that someone from the Attorney General's Office might be willing to accept this responsibility. In any event the parties should attempt to agree on a nominee and failing agreement each party should submit its own nominee and the court will thereupon decide the issue. The court holds that the plaintiffs, as prevailing parties, are entitled to an award of attorney's fees. The parties should attempt to settle upon a reasonable fee.

IT IS THEREFORE ORDERED that the individual class members' motion to show cause for contempt be, and it is hereby, granted. It is further ordered that Colonel Tommy Goodwin pay a fine in the amount of $500.00. It is further ordered that Defendant Scarberough pay a fine in the amount of $100.00. It is further ordered that the parties confer as to an appropriate neutral instructor upon the meaning of the Consent Decree and submit the name upon which they have agreed, or suggestions in the absence of agrement, within 5 days of the date of this order.